UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X     10 Civ. 199 (RJH)(HBP)

IN RE PIZZUTI, et al.                :     MEMORANDUM OPINION
                                           AND ORDER
-----------------------------------X

            PITMAN, United States Magistrate Judge:


I.   Introduction


            Petitioner Joseph Genua, an inmate in federal custody,

commenced this habeas corpus proceeding pursuant to 28 U.S.C.

§ 2255, claiming that his conviction violated certain of his

federally protected rights.  By motion dated April 27, 2010

(Docket Item 318 in 02 Cr. 1237), petitioner seeks to have his

Section 2255 motion supplemented by the arguments made in co-

defendant Angelo DiPietro's Section 2255 motion.  This request is

granted.

            By the same motion, petitioner also seeks to have

counsel appointed to represent him pursuant to the Criminal

Justice Act, 18 U.S.C. § 3006A.  For the reasons set forth below,

the motion is denied without prejudice to renewal.


II.  Analysis


            It is well settled that there is no constitutional

right to counsel in a habeas corpus proceeding such as this one;

rather, the appointment of counsel in such a proceeding is a matter of discretion.  Wright v. West, 505 U.S. 277, 293 (1992); Pennsylvania v. Finley, 481 U.S. 551, 555-59 (1987); Heath v. United States Parole Comm'n, 788 F.2d 85, 88 (2d Cir. 1986); Moolenaar v. Mantella, 00 Civ. 6380 (RMB)(KNF), 2001 WL 43602 at *1 (S.D.N.Y. Jan. 18, 2001) (Fox, M.J.).  Accordingly, petitioner's application should be analyzed in the same manner as any other application for pro bono counsel in a civil case.

        The factors to be considered in ruling on a motion for pro bono counsel are well settled and include "the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, [the plaintiff's] efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." Cooper v. A. Sargenti Co., 877 F.2d 170, 172 (2d Cir. 1989).  Of these, "[t]he factor which command[s] the most attention [is] the merits."  Cooper v. A. Sargenti Co., supra, 877 F.2d at 172. Accord Odom v. Sielaff, 90 Civ. 7659 (DAB), 1996 WL 208203 at *1 (S.D.N.Y. April 26, 1996) (Batts, D.J.); see Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004).  As noted over twenty years ago by the Court of Appeals:

> Courts do not perform a useful service if they appoint
> a volunteer lawyer to a case which a private lawyer
> would not take if it were brought to his or her atten-

2

> tion.  Nor do courts perform a socially justified
> function when they request the services of a volunteer
> lawyer for a meritless case that no lawyer would take
> were the plaintiff not indigent.

Cooper v. A. Sargenti Co., supra, 877 F.2d at 174; see also

Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997) ("In

deciding whether to appoint counsel . . . the district judge

should first determine whether the indigent's position seems

likely to be of substance." (citation and internal quotation

marks omitted)).

> The Court of Appeals for the Second Circuit has

> stated in various ways the applicable standard for
> assessing the merits of a pro se litigant's claim.  In
> Hodge [v. Police Officers, 802 F.2d 58 (2d Cir. 1986)],
> [the Court of Appeals] noted that "[e]ven where the
> claim is not frivolous, counsel is often unwarranted
> where the indigent's chances of success are extremely
> slim," and advised that a district judge should deter-
> mine whether the pro se litigant's "position seems
> likely to be of substance," or showed "some chance of
> success."  Hodge, 802 F.2d at 60-61 (internal quotation
> marks and citation omitted).  In Cooper v. A. Sargenti
> Co., [the Court of Appeals] reiterated the importance
> of requiring indigent litigants seeking appointed
> counsel "to first pass the test of likely merit."  877
> F.2d 170, 173 (2d Cir. 1989) (per curiam).

Ferrelli v. River Manor Health Care Ctr., 323 F.3d 196, 204

(2d Cir. 2003).

> I am willing to assume that petitioner lacks the

resources to retain counsel because he is incarcerated.  Although

he provides no information on the subject, I am also willing to

3

assume that petitioner needs an attorney because he has no legal
training.  However, petitioner's application establishes none of
the other elements relevant to an application for counsel.  For
example, petitioner provides no information concerning the steps,
if any, he has taken to find an attorney on his own.

In addition, it does not appear at this time that
petitioner's claims are sufficiently meritorious to warrant the
appointment of counsel.

Following a jury trial before the late Honorable
Shirley Wohl Kram, United States District Judge, petitioner was
convicted of conspiracy to commit extortion and extortion in
violation of 18 U.S.C. § 1951 and 18 U.S.C. § 1952, for which he
was sentenced to a term of imprisonment of 121 months.  Peti-
tioner asserts three claims arising out of events allegedly
occurring prior to, during and subsequent to his trial:  (1) the
government failed to turn over exculpatory evidence that would
have demonstrated actual innocence, thereby violating Brady v.
Maryland, 373 U.S. 83, 87-88 (1963); (2) his counsel was ineffec-
tive for abandoning his Batson[1] challenge of the government's use
of peremptory strikes, for failing to interview certain members
of an organized crime task force after two task force members

---

[1]Batson v. Kentucky, 476 U.S. 79 (1986).

claimed that petitioner confessed, and for failing to appeal what he claims were the court's erroneous jury instruction regarding reasonable doubt as to each element of the crime, and (3) newly discovered evidence shows that an informant testifying against him, Din Celaj, committed perjury (Memorandum of Law in Support of 28 U.S.C. § 2255 Motion to Vacate, Set Aside or Correct Sentence ("Pet. Memo in Support"), dated February 8, 2010 (Docket Item 3 in 10 Civ. 1003)).

In his first claim, petitioner alleges that the government failed to turn over tape recordings of two interviews conducted by state and federal officials of witness Frank Taddeo. Petitioner claims that Taddeo told his interviewers in August 2004 and January 2005 that petitioner took no part in the events involving victim John Perazzo. Petitioner further claims that he only found out about these interviews in early 2009 after speaking to Taddeo by telephone, and that the government never revealed or turned over these recordings (Pet. Memo in Support at 1).

The standards applicable to a collateral attack on a conviction alleging a Brady violation were succinctly set forth by the Honorable Lewis A. Kaplan, United States District Judge, in Lamberti v. United States, 22 F. Supp. 2d 60, 66-67 (S.D.N.Y.

1998), <u>aff'd</u> <u>sub</u> <u>nom</u>. <u>without</u> <u>published</u> <u>opinion</u>, <u>Badalamenti v.</u>

<u>United States</u>, 201 F.3d 430 (2d Cir. 1999):

> In order to establish a <u>Brady v. Maryland</u> viola-
> tion, the defendant must show that (1) the government
> suppressed favorable evidence, and (2) the evidence the
> government suppressed was material.  A defendant cannot
> satisfy the suppression requirement if the defendant,
> directly or through counsel, "either knew, or should
> have known, of the essential facts permitting him to
> take advantage of [that] evidence."  As for the materi-
> ality requirement, "favorable evidence is material, and
> constitutional error results from its suppression by
> the government, if there is a reasonable probability
> that, had the evidence been disclosed to the defense,
> the result of the proceeding would have been differ-
> ent."  "A 'reasonable probability' is 'a probability
> sufficient to undermine confidence in the outcome' of
> the case."

(footnotes and citations omitted).  <u>See</u> <u>also</u> <u>Banks v. Dretke</u>, 540

U.S. 668, 691 (2004); <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82

(1999); <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 250-51 (2d Cir.

1998); <u>Leake v. Senkowski</u>, 01 Civ. 7559 (SHS)(GWG),

2004 WL 1464889 at *19 (S.D.N.Y. June 30, 2004) (Gorenstein,

M.J.) (Report & Recommendation).

The government argues, in its opposition to Genua's

Section 2255 motion, that it satisfied its disclosure obligations

by having notified defense counsel prior to trial that the

defense may want to speak to witnesses such as Taddeo, and by

providing defense counsel with a description of these witnesses'

statements (Memorandum of Law of the United States of America in

Opposition to Motions of Angelo DiPietro, Michael Pizzuti and Joseph Genua Under 28 U.S.C. § 2255 and in Opposition to DiPietro's Motion for Discovery ("Gov't Opp. Memo"), dated July 30, 2010 (Docket Item 9 in 10 Civ. 199) at 38). Furthermore, the parties agree Taddeo was present with Perazzo on June 29, 2001, when a kidnapping of Perazzo was found to have occurred (Gov't Opp. Memo at 38; Pet. Memo in Support at 3). The government argues that because Taddeo was present with petitioner and other defendants during the charged events, it is obvious that they knew Taddeo and knew how useful his testimony would (or would not) be.

Additionally, the government claims that DiPietro's defense counsel, Joseph A. Bondy, Esq., and co-defendant Angelo Capalbo's defense counsel, William Aronwald, Esq., interviewed Taddeo before trial on separate occasions (Gov't Opp. Memo at 39 n.12). Finally, the government claims that the Assistant United States Attorneys and the FBI agent present with Taddeo during a 2004 interview do not recall it being recorded or memorialized, and a search of an FBI database revealed no report was prepared (Gov't Opp. Memo at 45 n.17).

For these reasons, it is extremely unlikely that petitioner will prevail on his first claim. Given that multiple government employees believe that one of the two meetings was

never recorded, and given that the government insists that Taddeo was known to -- and an acquaintance of -- petitioner and his co-defendants, it is difficult to see petitioner prevailing on the threshold prong of whether the government suppressed favorable evidence.  On the contrary, a reasonable conclusion to draw is that petitioner would have known Taddeo's value as a witness well before trial.

Petitioner's next claim alleges that counsel was ineffective in three different respects.

In order to prevail on an ineffective assistance of counsel claim, a habeas petitioner must meet the now-familiar two-part test set forth in Strickland v. Washington, 466 U.S. 668, 686-87 (1984):

> The benchmark for judging any claim of ineffec-
> tiveness must be whether counsel's conduct so under-
> mined the proper functioning of the adversarial process
> that the trial cannot be relied on as having produced a
> just result.
>
> . . . .
>
> A convicted defendant's claim that counsel's
> assistance was so defective as to require reversal of a
> conviction . . . has two components.  First, the defen-
> dant must show that counsel's performance was defi-
> cient.  This requires showing that counsel made errors
> so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth Amend-
> ment.  Second, the defendant must show that the defi-
> cient performance prejudiced the defense.  This re-
> quires showing that counsel's errors were so serious as
> to deprive the defendant of a fair trial, a trial whose

result is reliable.  Unless a defendant makes both
showings, it cannot be said that the conviction . . .
resulted from a breakdown in the adversary process that
renders the result unreliable.

Accord Davis v. Greiner, 428 F.3d 81, 87 (2d Cir. 2005); Greiner
v. Wells, 417 F.3d 305, 319 (2d Cir. 2005); Aeid v. Bennett, 296
F.3d 58, 62-63 (2d Cir. 2002); Hurel Guerrero v. United States,
186 F.3d 275, 281-82 (2d Cir. 1999); McKee v. United States, 167
F.3d 103, 106-07 (2d Cir. 1999); Jackson v. Leonardo, 162 F.3d
81, 85 (2d Cir. 1998).

     In determining whether counsel's performance was
objectively deficient, courts "must indulge a strong presumption
that counsel's conduct falls within the wide range of reasonable
professional assistance; that is, the [petitioner] must overcome
the presumption that, under the circumstances, the challenged
action might be considered sound trial strategy."  Strickland v.
Washington, supra, 466 U.S. at 689 (citation and internal quota-
tion marks omitted); accord Bell v. Cone, 535 U.S. 685, 698
(2002).

     The second prong of the test -- actual prejudice --
requires that the petitioner show that, but for trial counsel's
errors, there is a "reasonable probability" that the result of
the trial would have been different.  "A reasonable probability

9

is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, supra, 466 U.S. at 694.

Finally, since the test outlined in Strickland is conjunctive, a habeas petitioner's failure to satisfy either prong requires that the challenge to the conviction be rejected. Strickland v. Washington, supra, 466 U.S. at 697.

Petitioner's first specification of ineffective assistance is his contention that his counsel abandoned a Batson challenge. In Batson v. Kentucky, supra, 476 U.S. at 89, the Supreme Court held that a prosecutor may not use peremptory challenges to discriminate against potential jurors along racial lines. "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. However, the Court in Batson also reaffirmed that a criminal defendant had no right to a jury solely or predominately composed of his own race. Batson v. Kentucky, supra, 476 U.S. at 85; see also Taylor v. Louisiana, 419 U.S. 522, 538 (1975) ("Defendants are not entitled to a jury of any particular composition . . . .").

10

The <u>Batson</u> Court formulated a three-part test "for assessing a prima facie case under the Equal Protection Clause." <u>Batson v. Kentucky</u>, <u>supra</u>, 476 U.S. at 93.

> First, a trial court must decide whether the party challenging the strike has made a <u>prima facie</u> showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race.  Such a <u>prima facie</u> case may be established, for example, by showing a pattern of strikes against a cognizable group.  <u>Id</u>. at 97, 106 S.Ct. 1712.  If the party making the <u>Batson</u> challenge establishes a <u>prima facie</u> case, the trial court must require the non-moving party or the party whose peremptory challenges are being examined, to proffer a race-neutral explanation for striking the potential juror.  <u>Id</u>. at 97, 106 S.Ct. 1712.  This second step does not require the non-moving party to give an explanation that is persuasive or even plausible.  <u>Purkett v. Elem</u>, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).  Finally, if the non-moving party proffers a race-neutral explanation, the trial court must determine whether the party ques-tioning the peremptory challenge has carried his or her burden of proving that the strike was motivated by purposeful discrimination.  <u>Batson</u>, 476 U.S. at 98, 106 S.Ct. 1712.  This third step of the <u>Batson</u> inquiry, requires a trial judge to make an ultimate determina-tion on the issue of discriminatory intent based on all the facts and circumstances and it is only here that the persuasiveness of the race-neutral explanation is relevant.  <u>Purkett</u>, 514 U.S. at 768, 115 S.Ct. 1769.

<u>Frazier v. New York</u>, 187 F. Supp. 2d 102, 114 (S.D.N.Y. 2002) (Sweet, D.J.), <u>aff'd</u>, 156 F. App'x 423 (2d Cir. 2005).

A "defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'"  <u>Johnson v. California</u>, 545 U.S. 162, <u>quoting</u> <u>Batson v. Kentucky</u>, <u>supra</u>, 476 U.S. at 93-

94.   In considering all the relevant circumstances that might give rise to a prima facie case, especially significant is a "pattern of strikes against black jurors." <u>Batson v. Kentucky</u>, <u>supra</u>, 476 U.S. at 96-97.  Statistical evidence, without more, may, under certain circumstances, give rise to a question of whether the prosecution struck prospective jurors because of their race, thus satisfying a defendant's burden of establishing a prima facie case.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 342 (2003) (statistical evidence alone may support a prima facie <u>Batson</u> claim even when the prosecution does not attempt to strike every member of a racial group from the jury); <u>see</u> <u>also</u> <u>Overton</u> <u>v. Newton</u>, 295 F.3d 270, 278 (2d Cir. 2002).

During jury selection for petitioner's trial, the government used two peremptory strikes to remove African-Americans (Pet. Memo in Support at 9).  Upon the striking of the second African-American, petitioner's counsel consulted his notes and spoke with co-counsel regarding the formulation of a <u>Batson</u> objection.  During a subsequent recess, petitioner's counsel had the following exchange with Judge Kram:

COUNSEL:  All joking aside, I don't make Ba[t]son charges lightly.

THE COURT:  I am glad because I was getting very suspicious.

12

> COUNSEL:  I have not made one in any of the trials I tried here in the Southern District on the defense side.
>
> THE COURT:  But you have given me a special honor?
>
> COUNSEL:  Because I like you, Judge.  Ultimately, after conferring with co-counsel, I am going to chal-lenge, make a Ba[t]son challenge.
>
> THE COURT:  You are not going to make it this minute.  We have something else to talk about.

(Tr. 295).[2]

Judge Kram then asked counsel whether 50 reserve jurors were needed to complete jury selection.  After resolving that issue, the court took a five-minute recess.  Upon resumption of the proceedings, neither petitioner's counsel nor any co-defen-dants' counsel raised the Batson challenge again (Pet. Memo in Support at 6, citing Tr. 295-595; Gov't Opp. Memo at 73).

Even assuming arguendo that petitioner's counsel was objectively deficient, petitioner's claim here is unlikely to succeed because he is unlikely to show a reasonable probability that his trial's outcome would have been different if his counsel had persisted in a Batson challenge.  In fact, petitioner's memo in support of his Section 2255 motion merely makes a conclusory statement that "[f]rom the arguments presented it is clear . . .

---

[2]"Tr." refers to the transcript of petitioner's trial.

13

that Mr. Genua was prejudiced by this ineffectiveness" (Pet. Memo in Support at 11).

The memo further states that "[h]ad counsel continued the challenge after the recess called by the court than [sic] their [sic] would have been a clearer and fuller record for the Court of [A]ppeals to evaluate this claim" (Pet. Memo in Support at 11).  Petitioner misses the point, though, because at this stage the burden is on the petitioner to show the court that but for his counsel's ineffectiveness, there is a reasonable probability that his trial's result would have been different.  Specifically, there is no showing of how the failure to persist in a Batson challenge prejudiced his trial, not his appeal.

Petitioner also argues that the validity of his Batson challenge (and, presumably, the extent of his counsel's ineffectiveness) can only be evaluated at a new trial or at an evidentiary hearing.  This argument is a non-sequitur.  Petitioner offers no evidence concerning the make-up of the jury that was ultimately seated, the race of the individual who replaced the second juror challenged by the prosecution or how many of the government's peremptory challenges were made against African-Americans.  These are all facts relevant to the first step of a Batson challenge and must be known to petitioner because he was present for jury selection (see Tr. 187-341).  Although the

14

ultimate merit of petitioner's first specification of ineffective assistance is not currently before me, the sparse record concerning this specification leads me to conclude that petitioner has not demonstrated sufficient merit to warrant the appointment of counsel.  Hodge v. Police Officers, supra, 802 F.2d at 60 ("Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." (inner quotations omitted)).

Petitioner's second specification of ineffective assistance is based on his counsel's failure to interview other members of an organized crime task force after two task force members claimed that Genua confessed.  Petitioner asserts that

> the only credible testimony against Mr. Genua was the testimony of the agents in regards to the alleged confession of Mr. Genua.  If [t]rial counsel would have investigated the other agents their [sic] is the posibility [sic] that these agents were not willing to go along with the 'perjured' testimony of the other agents.  This prejudiced [M]r. Genua and precluded a fair trial on his behalf.

(Pet. Memo in Support at 11-12).

The law requires defense counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a

heavy measure of deference to counsel's judgments." <u>Strickland</u>
<u>v. Washington</u>, <u>supra</u>, 466 U.S. at 691.  The law "does not, how-
ever, compel defense counsel to investigate comprehensively every
lead or possible defense . . . or to scour the globe on the
off-chance something will turn up . . . ." <u>Greiner v. Wells</u>,
<u>supra</u>, 417 F.3d at 321 (citations and internal quotation marks
omitted).

       Petitioner's contention that interviews of other task
force members would have yielded exculpatory evidence is pure
speculation.  In order to establish the prejudice prong of a
<u>Strickland</u> claim based on a failure to interview, there must at
least be some showing that the witnesses in issue had some testi-
mony helpful to the defense.  <u>Bridges v. United States</u>, 04 Civ.
2715 (HB), 2005 WL 1798084 at *4 (S.D.N.Y. Aug. 1, 2005) (Baer,
D.J.), <u>citing</u> <u>Buitrago v. Scully</u>, 705 F. Supp. 952, 954 (S.D.N.Y.
1989) (Lasker, D.J.).  Petitioner offers nothing suggesting that
the other task force members would have offered exculpatory
testimony.

       Moreover, "the decision to call or bypass particular
witnesses is peculiarly a question of trial strategy . . . which
courts will practically never second-guess." <u>United States ex</u>
<u>rel. Walker v. Henderson</u>, 492 F.2d 1311, 1314 (2d Cir. 1974),
<u>citing</u> <u>United States v. Matalon</u>, 445 F.2d 1215, 1219 (2d Cir.

1971), <u>and</u> <u>United States v. Garguilo</u>, 324 F.2d 795, 797 (2d Cir. 1963).   Thus, it is difficult to conclude that petitioner's trial counsel was objectively deficient in the first instance.   Thus, this specification of ineffective assistance also appears destined to fail and does not, therefore, merit the appointment of counsel.

Petitioner's third specification of ineffective assistance is that his counsel failed to object to an erroneous jury instruction, failed to get timely affidavit evidence concerning the alleged error and failed to appeal the faulty instruction. Petitioner's co-defendants did appeal the putatively erroneous jury instruction (<u>see</u> Brief of Defendant-Appellant Angelo DiPietro at 51-56).   This putative error was in fact a transcription mistake that was subsequently corrected by Judge Kram, and the Second Circuit found defendants' argument to be "without merit."   <u>United States v. Genua</u>, 274 F. App'x 53, 56 (2d Cir. 2008).   Therefore, there never really was any erroneous jury instruction and, thus, nothing to which counsel could have properly objected.

Petitioner's final claim -- that the government knowingly elicited perjury from the main informant testifying against him, Din Celaj -- is similarly lacking in merit.   The standards

applicable to a collateral attack on a conviction alleging newly

discovered evidence of perjury are particularly rigorous.

> In order to be granted a new trial on the ground that a
> witness committed perjury, the defendant must show that
> "(i) the witness actually committed perjury . . .; (ii)
> the alleged perjury was material . . .; (iii) the gov-
> ernment knew or should have known of the perjury at
> [the] time of trial . . .; and (iv) the perjured testi-
> mony remained undisclosed during trial. . . ."

United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009),

quoting United States v. Zichettello, 208 F.3d 72, 102 (2d Cir.

2000) (internal quotation marks omitted).

"[T]he clearly established Supreme Court precedent

relevant to [a] habeas petition is that the conviction must be

set aside if (1) the prosecution actually knew of . . . false

testimony, and (2) there is any reasonable likelihood that the

false testimony could have affected the judgment of the jury."

Drake v. Portuondo, 553 F.3d 230, 241 (2d Cir. 2009); see also

United States v. Spinelli, 551 F.3d 159, 166 (2d Cir. 2008);

United States v. Stewart, 433 F.3d 273, 298 (2d Cir. 2006).[3]

---

[3]"[I]f the prosecution was not aware of the perjury, a
defendant can obtain a new trial only where the false testimony
leads to 'a firm belief that but for the perjured testimony, the
defendant would most likely not have been convicted.'"  United
States v. Stewart, 433 F.3d 273, 298 (2d Cir. 2006), quoting
United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991)
(internal quotation marks omitted).

In his Section 2255 memo, petitioner refers to the arguments his co-defendants made concerning this claim (Pet. Memo in Support at 16-17; see also Angelo DiPietro's Motion for a New Trial, dated July 11, 2008 (Docket Item 262 in 02 Cr. 1237) at 23-26 ("The Prosecution's decision to make misleading arguments and use perjured testimony to gain these defendants convictions violated due process and defied the rudimentary demands of justice.").  Petitioner also attaches a copy of a newspaper article detailing Celaj's most recent conviction as an exhibit (Pet. Memo in Support, Attachment D).

In 2005, Celaj testified to the extortion plot that led to petitioner's conviction.  At that time, Celaj was subject to a final order of deportation (Gov't Opp. Memo at 49).  He testified on direct examination that he had not appealed the deportation order and expected to be deported after serving his prison sentences (Gov't Opp. Memo at 47).  Furthermore, Celaj testified that no provision existed in his cooperation agreement with the government for relief from the deportation order (Gov't Opp. Memo at 47).  On cross-examination, Celaj was asked if he planned to ask the government for help to avoid deportation (Gov't Opp. Memo at 47-48).  He said that he thought it was impossible to avoid deportation and that he had no plans to ask for government intervention (Gov't Opp. Memo at 47-48).

19

Subsequent to petitioner's conviction, Celaj did chal-
lenge his deportation order and "obtain[ed] a deferral on the
grounds that the organized crime problem was so severe in Albania
that it would be dangerous to return Celaj there" (Gov't Opp.
Memo at 50 n.19).  The government submits that the immigration
judge from the Department of Justice Executive Office for Immi-
gration Review reached this decision without any input from the
prosecutors in petitioner's case.

Pursuant to its agreement with Celaj, the government
did provide Celaj's immigration lawyer with copies of the charges
against Celaj, his cooperation agreement and the U.S.S.G. § 5K1.1
letter that the government submitted to Judge Kram in advance of
Celaj's sentencing (Gov't Opp. Memo at 49-50).  There is no
evidence supporting an inference that a secret deal existed
between the government and Celaj, or that Celaj was committing
perjury at the time he testified.  There is scant evidence,
therefore, that Celaj was lying on the stand at Genua's trial
simply because he subsequently appealed his deportation order
successfully.  Celaj might have simply changed his mind -- or his
attorney may have explained and pursued a previously unknown
ground for appeal after the fact -- and there is no evidence that
Genua puts forth suggesting otherwise.

20

It appears petitioner will have difficulty meeting the rigorous Second Circuit test.  He likely cannot prove that Celaj did, in fact, commit perjury, or prove that the evidence was material.  Furthermore, because he offers no evidence that the prosecution knew of the perjury he alleges, he must prove that but for this alleged perjury, petitioner most likely would not have been convicted.  Because petitioner is also likely to lose on this claim, I see no reason to appoint counsel for this ground.

III.  Conclusion

Accordingly, for all the foregoing reasons, petitioner's motion for the appointment of counsel pursuant to the Criminal Justice Act is denied without prejudice to renewal. Any renewed application should be accompanied by an affidavit establishing the merits.

Dated:  New York, New York
        December 7, 2010

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge

21

Copies mailed to:

Mr. Joseph Genua
56988-054
FCI Butner Medium II
Federal Correctional Institution
P.O. Box 1500
Butner, North Carolina   27509

Mr. Michael Pizzuti
51089-054
FCI Allenwood Low
Federal Correctional Institution
P.O. Box 1000
White Deer, Pennsylvania   17887

Joseph A. Bondy, Esq.
Law Offices of Joseph A. Bondy
Suite 1200
20 Vesey Street
New York, New York   10007

Hadassa R. Waxman, Esq.
United States Attorney Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York   10007