```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

MICHAEL PIZZUTI,                   :

                 Petitioner,       :
                                       10 Civ. 199 (RJH)(HBP)
      -against-                    :

UNITED STATES OF AMERICA,          :

                 Respondent.       :

----------------------------------X

ANGELO DiPIETRO,                   :

                 Petitioner,       :
                                       10 Civ. 2585 (RJH)(HBP)
      -against-                    :

UNITED STATES OF AMERICA,          :

                 Respondent.       :

----------------------------------X

UNITED STATES OF AMERICA,          :
                                       02 Cr. 1237 (RJH)(HBP)
                 Plaintiff,        :

      -against-                    :   OPINION
                                       AND ORDER
                                   :
ANGELO DiPIETRO, et al.,
                                   :
                 Defendant.
                                   :
----------------------------------X


         PITMAN, United States Magistrate Judge:
```

I.   <u>Introduction</u>

By motions dated July 23, September 13 and September 27, 2010 (Docket Item 5 in 10 Civ. 2585 and Docket Items 330 and 334 in 02 Cr. 1237), petitioners Angelo DiPietro and Michael Pizzuti move for discovery.  For the reasons set forth below, the motions are granted in part and denied in part.  Specifically, petitioners are entitled to all FBI Form 302's and notes concerning interviews with or debriefings of Maurizio Sanginiti, including an unredacted version of the Form 302 DiPietro received in response to his FOIA request.  Furthermore, if the Form 302, dated March 28, 2005, produced in pretrial discovery is not identical to the unredacted version of the Form 302 produced in response to DiPietro's FOIA request, the government is also to provide an explanation of why two different versions of the same document were prepared.  The government is also directed to produce the original wiretap application for Pizzuti's telephone number, 914-490-1007 if the application is in the government's possession, custody or control.  The motions are denied without prejudice to renewal in all other respects.

II.  Facts

    A.  Facts Giving Rise to
        Petitioners' Convictions[1]

        1.  Background

        Petitioners' convictions arose out of numerous violent
crimes committed between 2001 to 2003, including crimes committed
in an effort to recover money from John Perazzo, a pyramid scheme
operator.  DiPietro's convictions stemmed from three types of
offenses:  (1) those involving the extortion of Perazzo; (2)
those involving a home-invasion robbery conspiracy, and (3)
loansharking.  Pizzuti's convictions were related solely to the
extortion of Perazzo.  DiPietro and Pizzuti were members of two
rival groups of disgruntled investors competing for priority in
reimbursement by Perazzo.

        Beginning in 2001, petitioners began extorting money
from Perazzo, an investment advisor who promised financial
returns to petitioners that he could not deliver.  Perazzo's
fraudulent activity is not in dispute; he was arrested and
charged by the Westchester County District Attorney's Office

---

        [1]The facts set forth herein were established at petitioners'
trial.

("WCDAO") on August 31, 2001, on crimes relating to his Ponzi scheme.  He pled guilty as part of a state cooperation agreement.

    2.   The Extortion by
         Pizzuti's Group

    Perazzo's pyramid scheme paid promised returns to investors through March 2001 (Tr. 1118).[2]  In April 2001, investors began having difficulty getting paid by Perazzo or even contacting him (Tr. 1118-19, 1376-77).  Various investors began suspecting that Perazzo was running a Ponzi scheme (Tr. 1379, 1419).  On May 10, 2001, Pizzuti told co-defendant Harold Bringman that Perazzo was "taking from Peter to pay Paul, trust me" (Tr. 1379).  Pizzuti subsequently began using force and threats of force to recover money from Perazzo (Tr. 1418-20).

    On May 30, 2001, Pizzuti organized a group to confront Perazzo and pressure him for money (Tr. 1399-1400, 1405).  Pizzuti arranged a confrontation at Perazzo's home between Perazzo and Bringman, Manny Pereira and others (Tr. 1405).  At Pizzuti's behest, Pereira threatened Perazzo, kicked lights and broke other property (Supplemental Memorandum of Movant Michael Pizzuti, filed August 30, 2010 ("Pizzuti Supplemental Habeas Memo") (Docket Item 327 in 02 Cr. 1237), at 8, citing GX 112 at

---

    [2]"Tr." refers to the transcript of petitioners' trial.

2; Tr. 1399).   Pizzuti later told co-defendant Angelo Capalbo,
"today, I set [Perazzo] . . . up with another ten . . . guys
. . . so I squeezed him real good" (Pizzuti Supplemental Habeas
Memo at 8, <u>citing</u> GX 115 at 2).   On June 6, 2001, Perazzo gave
$10,000 to Pizzuti (Pizzuti Supplemental Habeas Memo at 8, <u>citing</u>
GX 125 at 2-3).   On June 11, 2001, a group again gathered at
Perazzo's house and pressured him for more money, and Pizzuti
later bragged, "it was the same gimmick like the last time" (Tr.
1423).   Pizzuti described Perazzo's reaction to the meeting,
stating, "the fucking guy came like a lamb, you know, taking all
the fucking insults from everybody . . . all kinds of names" (Tr.
1424).   Pizzuti organized these events in a way that he could
disavow his involvement and could appear as Perazzo's protector
so that Perazzo would be more likely to pay him (Tr. 1418-20).

On June 20, 2001, Pizzuti conspired with his brother,
Ralph, to use a gun to induce payment from Perazzo (Tr. 1425-26).
When Ralph Pizzuti left his house with a gun, Ralph's wife called
Michael Pizzuti seeking an explanation (Tr. 1426).   Michael
Pizzuti explained that Ralph took the gun to ensure that Perazzo
would pay (Tr. 1426).   Michael Pizzuti told Ralph Pizzuti's wife
that Perazzo "[has] got to collect a lot of money and as soon as
he collects it, he's got to pay" (Tr. 1426).   When Ralph
Pizzuti's wife stated that Perazzo was running a Ponzi scheme,

Michael Pizzuti replied, "[w]e're all going to get our money, trust me" (Pizzuti Supplemental Habeas Memo at 9, <u>citing</u> GX 132 at 4).

> 3.  The June 29, 2001
>     Kidnapping by
>     <u>DiPietro's Group</u>

In Spring 2001, co-defendant Maurizio Sanginiti re-cruited DiPietro to collect from Perazzo because of DiPietro's reputation as a "tough guy" who excelled at collecting money (Tr. 1123-26, 1912-14, 2562-63).  On June 28, 2001, following his receipt of a check for $147,000 from Perazzo that the drawee bank refused to pay, Sanginiti agreed with DiPietro and Capalbo to kidnap Perazzo (Tr. 1126, 1460, 1484, 1934, 2154, 2574-75).  The kidnapping was intended to ensure they were repaid before Pizzuti (Tr. 1126).  On June 29, 2001, Perazzo was kidnapped in Yonkers at the Cross County Shopping Center (Tr. 1134-35).  Joseph Genua, Richard Wieland and Frank Taddeo were among the individuals involved (Tr. 1136-37).

The kidnapping took place as follows:  Sanginiti, Genua and others waited in a white van in a parking lot near an Applebee's restaurant for Perazzo to be brought over to them (Tr. 1134-44, 1150, 1170-71, 1934, 1939, 1985).  When Perazzo reached the van, Genua grabbed Perazzo by the neck, placed him in the

6

front seat and told Perazzo "to shut the fuck up and do what I tell you" (Tr. 1139-40).  Genua, who was in back of Perazzo in the van, wrapped his arm around Perazzo's neck and held Perazzo in the seat (Tr. 1141).  Perazzo began "sweating, changing colors [and was] nervous [and] stuttering" (Tr. 1140).

The kidnappers took Perazzo to the basement of DiPietro's house in Mount Vernon, New York (Tr. 1141-44). Perazzo was stripped to ensure he wasn't wearing a recording device (Tr. 1157-58, 1943).  DiPietro held a revolver to Perazzo's face and asked when Perazzo would come up with the money (Tr. 1158-59).  Genua threatened to blow off Perazzo's genitals with an explosive device (Tr. 1161-62, 2527-33, 2567). Perazzo eventually told his kidnappers he had money in the trunk of his car (Tr. 1163, 1165).  Genua and DiPietro's son, Anthony DiPietro, returned to the Cross County Shopping Center and retrieved $11,000 from Perazzo's car, and Perazzo was released (Tr. 750, 1163, 1168-69).  Following the kidnapping, Genua stayed at Perazzo's house for a few days to monitor Perazzo at DiPietro's behest and control any money that came into Perazzo's possession (Tr. 1187, 2554).

On June 30, 2001, DiPietro and others met with Perazzo to pressure him not to report the kidnapping and to repay the money (Tr. 1175-76, 1494, 2052-53).  During the meeting,

7

Perazzo's car was searched for more money (Tr. 1180, 1183-86, 1494-95, 1616-20).  No money was found, but a letter was found that Perazzo had written to the FBI and other law enforcement authorities (Tr. 1180, 1183-86, 1494-95, 1582, 1616-20).  The letter read that "[b]y you receiving this letter, I am either dead or kidnapped again and will shortly be dead" (Tr. 1618).  Perazzo's letter stated that he had been kidnapped from Applebee's on June 29, 2001 by Sanginiti, Capalbo, "another Angelo and a Frank" (Tr. 1618).  The letter stated that Pizzuti would know the full names of Perazzo's kidnappers and gave Pizzuti's name and business and home addresses and telephone numbers (Tr. 1618).  The letter further stated that an attorney named Al Mosiello was also involved (Tr. 1619).  The letter gave details of the "drastic actions" that had been taken against Perazzo, including threats to "[c]ut [him] up and put [him] into body bags" (Tr. 1619).

> 4.  The July 9, 2001
>      Kidnapping by Pizzuti

On July 9, 2001, DiPietro's associate, Weiland, was staying in Perazzo's home to monitor Perazzo (Tr. 1535-36, 2567-68).  Pizzuti found this out, and Pizzuti's group headed to Perazzo's house out of concern that Perazzo was favoring

DiPietro's group with respect to the repayment of money (Tr. 1188, 1521-24, 1534-36).  When Pizzuti's group arrived, Weiland called Sanginiti to inform him (Tr. 1188, 1831, 2569). Sanginiti, in turn, called DiPietro and Capalbo and arranged a meeting (Tr. 1188).  DiPietro also called Din Celaj and Marc Nickolson and told them to meet him and to bring guns to the meeting (Tr. 1188, 4316-17).  DiPietro's group devised a plan to take Perazzo away from Pizzuti's group (Tr. 4320).

When DiPietro's group arrived at Perazzo's house, Pizzuti was holding a rifle to Perazzo's face (Tr. 1196, 1199-2000, 1256-60, 1539, 2418-32, 3750).  Pizzuti told DiPietro's group that they had to go through him if they wanted money from Perazzo (Tr. 1196, 1217-18, 4327).  Pizzuti then dragged Perazzo out of the house at gunpoint and threw him into the back of a car (Tr. 1197, 1218-20, 1266, 2435-36, 4330-31).  Pizzuti eventually took Perazzo to Nyack, New York, where Perazzo spent the night in a hotel with Pizzuti associate Carl Macchiarulo before making a bank transfer of $30,000 to Macchiarulo the following day (Tr. 1534-35, 1557, 1626, 1635-36).

Pizzuti's group left Perazzo's house at the same time Pizzuti left with Perazzo (Tr. 1266, 1530-31).  Bringman was the last member of Pizzuti's group to leave, and Sanginiti and Capalbo ordered Celaj to grab Bringman to find out where Pizzuti

was taking Perazzo (Tr. 1266-68, 1530-31).  As Bringman drove away, DiPietro instructed Celaj to "shoot his fucking ass, shoot his fucking ass" (Tr. 4334).

A car chase commenced on the southbound Hutchinson River Parkway, with Celaj and Nickolson pursuing Bringman at speeds exceeding 100 miles per hour (Tr. 1224-26, 1268, 1528-29, 3738-39, 4334).  Celaj fired several shots and hit Bringman's car, but Bringman escaped while Celaj crashed into a guardrail (Tr. 1225-26, 1233-34, 1271, 1537, 3738-42, 4336).  That evening, the rival groups decided to peacefully join forces to coordinate the recovery of money (Tr. 1233-34, 1272-73, 1545, 1577).  This joint cooperation lasted until Perazzo's arrest (Tr. 1273-75, 1278-79).

> 5.  Destruction of Evidence
>     on Perazzo's Computer

On July 10, 2001, Pizzuti, Sanginiti and Capalbo met with attorney Mosiello for advice concerning the letter Perazzo had written to the FBI and other law enforcement authorities that they had found in Perazzo's car (Tr. 1279, 1548, 1620-21). Mosiello advised them that arrests might occur if the authorities received the letter (Tr. 1279, 1548, 1620-21).  Following the meeting, Capalbo and Mosiello went to Perazzo's house to delete

any files on Perazzo's computer related to the investment scheme, particularly the letter (Tr. 1302-03, 1319, 1569-71, 1621, 2376-77, 2695, 2820-22).  Pizzuti called Capalbo and Mosiello while they were at the house and encouraged them to erase anything with Pizzuti's name or those of his conspirators (Pizzuti Supplemental Habeas Memo at 16-17, citing GX 169 at 2-3).

Following Perazzo's arrest, the WCDAO seized, inter alia, Perazzo's computer (Tr. 3266-67).  A subsequent forensic analysis determined that approximately 60 computer files were deleted on July 10, 2001 (Tr. 3288).  While 43 of the files no longer existed on the hard drive, contents of 17 files were recovered (Tr. 3300, 3306-07).  A full copy of Perazzo's letter to the FBI and other agencies was not found, but traces of prior drafts of the letter were found (Tr. 3307-09, 3311-14, 3344-45).

### 6. DiPietro's Involvement in Home Invasion Robberies

In addition to extorting Perazzo, DiPietro was involved in a series of robberies of residences in Westchester County, New York, that he believed contained large amounts of cash (Tr. 1648-50).  In the Spring of 2001, DiPietro began planning a robbery in Eastchester, New York, with Capalbo, Sanginiti, Nickolson and Celaj (Tr. 1658-59, 3770-71, 4364).  DiPietro's relatives owned

11

the residence, and he believed there was $2.3 million in the house because of the family's involvement in the real estate business (Tr. 3770-72, 4365).  DiPietro told at least one con-spirator that a father, mother, son and grandmother lived in the house, and to "try your hardest not to hurt no one [sic] but if you have to, do what you got to do" (Tr. 4365-66).

On July 18, 2001, Celaj, Nickolson and Ded Nicaj entered the Eastchester home, believing it was empty (Tr. 4367-68, 4372).  The men heard voices in the home, however, and confronted the mother and grandmother with a gun (Tr. 4372). Nicaj attempted to tie the mother up, and Celaj pointed the gun at her (Tr. 4372).  As the mother was leading Celaj to the money, the son walked into the house (Tr. 4374-75).  Celaj pointed the gun at the son, and the situation soon became "out of control," as "everybody was screaming in the house" (Tr. 3795-96).  One of the conspirators yelled that he had spotted police, and the men fled without taking any money (Tr. 4375-76).

While Nickolson and Nicaj were arrested immediately after the bungled robbery, Celaj called a lookout to pick him up and escaped (Tr. 3803-04, 4376-77).  Celaj subsequently called DiPietro to set up a meeting, and Celaj and DiPietro met and discussed the failed robbery (Tr. 4378-79).  DiPietro told Celaj,

"you have to lay very low . . . it's crazy up there in Eastchester, too much cops [sic]" (Tr. 4379).

B.   Convictions and Appeals

On July 12, 2005, petitioners were convicted following a jury trial before the late Honorable Shirley Wohl Kram, United States District Judge.  In 2006, Judge Kram sentenced DiPietro to 708 months in prison and Pizzuti to 219 months in prison (Docket Items 204, 206 in 02 Cr. 1237).

On appeal, DiPietro joined in his co-defendants' arguments and raised the following issues:  (1) the disqualification of his trial counsel for previously representing a co-defendant violated his Sixth Amendment right to counsel of his choice; (2) the dismissal of the jury without inquiry prior to it being sworn -- due to an incident where a co-defendant collapsed in court because of a serious illness -- violated DiPietro's Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to due process; (3) the district court infringed the public's and the press's First Amendment right of access and DiPietro's Sixth Amendment right to a public trial by conducting court proceedings during trial in the robing room outside DiPietro's presence; (4) his Sixth Amendment right of confrontation was violated by the admission of testimonial hearsay over

13

his objection; (5) the government failed to present sufficient
evidence to establish the jurisdictional nexus and effect on
interstate commerce to satisfy the essential elements of 18
U.S.C. §§ 894 and 1951; (6) the district court erred in denying
his motion to vacate and dismiss one of the two counts alleging a
violation of 18 U.S.C. § 924(c) on the ground that both counts
involve the same unit of prosecution; (7) his right to a fair
trial was violated by denying his trial counsel the opportunity
to object to the court's jury instructions as required by the
Federal Rules of Criminal Procedure; (8) the district court erred
in instructing the jury that the government is not required to
prove each and every element of each of the alleged crimes beyond
a reasonable doubt, and (9) the cumulative effect of certain
rulings denied his Fourteenth Amendment right to due process and
a fair trial (Brief of Defendant-Appellant Angelo DiPietro, dated
March 16, 2007, available at 2007 WL 7072774).

On appeal, Pizzuti joined in the arguments of his co-
defendants and raised the following independent issues:  (1) the
district court erred in permitting the prosecution to introduce,
over defense objection, Nickolson's testimony of purported
conspirator statements made by Celaj following the July 9, 2001,
incident at Perazzo's house, where there was no evidence that
Pizzuti had ever conspired with either Nickolson or Celaj, and

14

(2) the evidence with respect to the obstruction of justice charge failed to prove a nexus between the intentional destruction of evidence and the likelihood of affecting the administration of justice, and (3) the evidence failed to prove that defendants "corruptly persuaded" Mosiello (Brief of Defendant-Appellant Michael Pizzuti, dated March 27, 2007, <u>available</u> <u>at</u> 2007 WL 6475428).

In 2008, DiPietro and Pizzuti's appeals were summarily denied by the Court of Appeals for the Second Circuit, and the Supreme Court denied writs of certiorari to both petitioners. <u>United States v. Genua</u>, 274 F. App'x 53, 53-56 (2d Cir. 2008), <u>cert</u>. <u>denied</u>, <u>Pizzuti v. United States</u>, 129 S. Ct. 1378 (2009), <u>and</u> <u>DiPietro v. United States</u>, 129 S. Ct. 1643 (2009).  The Second Circuit held, <u>inter alia</u>, that:  (1) the trial court did not abuse its discretion by disqualifying DiPietro's attorney; (2) the trial court did not abuse its discretion by dismissing the jury pool where a co-defendant was "moaning in pain[] in full view of jurors and potential jurors," where several defense attorneys aided him but prosecutors did not, and where one defense attorney "yelled to an FBI agent, in the presence of the jury, '[D]idn't they teach you CPR at the FBI Academy?'" (274 F. App'x at 55); (3) DiPietro's convictions on the two 18 U.S.C. § 924(c) counts were proper because the underlying offenses

formed two distinct units of prosecution; (4) the trial court did not improperly prohibit DiPietro's counsel from objecting; (5) none of the appellants' challenges to the sufficiency of the evidence warranted a reversal; (6) the trial court did not abuse its discretion in admitting certain evidence against the various defendants, and (7) DiPietro and Pizzuti's remaining arguments were "without merit."  United States v. Genua, supra, 274 F. App'x at 53-56.[3]

  C. Motions for New Trial
    and Section 2255 Motions

   In 2008, DiPietro and Pizzuti filed motions for new trials under Federal Rule of Criminal Procedure 33, which are still pending (Docket Items 259, 262 in 02 Cr. 1237).  In 2010, they filed the instant motions under 18 U.S.C. § 2255 to vacate, set aside, or correct their sentences.

   DiPietro asserts the following claims in support of his Section 2255 petition:  (1) new evidence has been discovered, including evidence the prosecution suppressed in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963); (2) the prosecution adduced false testimony; (3) the prosecution misled the court;

---

   [3]The Second Circuit also expressly rejected three of Genua's arguments.

(4) resentencing of DiPietro is warranted on the 18 U.S.C.
§ 924(c) convictions (DiPietro's Memorandum of Law in Support of
28 U.S.C. § 2255 Motion to Vacate, Set Aside or Correct Sentence
("DiPietro Habeas Memo"), dated March 22, 2010 (Docket Item 1 at
10 Civ. 2585)).  By letter dated February 4, 2011, to the under-
signed, DiPietro consented to the complete incorporation of his
new trial motion into his Section 2255 petition.  DiPietro did
not assert any claims in his motion for a new trial that are
independent from his Section 2255 petition, but he did identify
other evidence that he claims is either newly discovered or was
not turned over by the government prior to trial.

  Pizzuti joins in the arguments of petitioners DiPietro
and Genua and asserts the following independent claims in support
of his Section 2255 petition:  (1) his counsel was ineffective in
violation of the Sixth Amendment; (2) the district court altered
a defective jury charge over the affirmation of the stenographer
who transcribed the court proceedings, violating Pizzuti's due
process rights; (3) Pizzuti's due process rights were violated by
the pervasive unfairness of the trial, as evidenced by, <u>inter
alia</u>, the denial of 22 defense motions, the court's refusal to
allow defense counsel to call Perazzo to the stand and the filing
of a superseding indictment on the eve of trial (Pizzuti's Motion
under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence

17

by a Person in Federal Custody, dated January 5, 2010 ("Pizzuti Habeas Memo") (Docket Item 1 in 10 Civ. 0199); Pizzuti Supplemental Habeas Memo).

On May 20, 2010, the Honorable Richard J. Holwell, United States District Judge, consolidated the Section 2255 motions of DiPietro, Genua and Pizzuti and referred the motion and the related motions in the criminal case, <u>United States v. DiPietro</u>, <u>et al</u>., 02 Cr. 1237, to me.

D.  <u>The Present Motions</u>

Petitioners' motions to compel discovery arise in connection with their Section 2255 claims.  Petitioner DiPietro requests the following discovery:

(1) All reports of investigation and rough notes of the Federal Bureau of Investigation ("FBI") or prosecutors' contacts or meetings -- including those of New York State Police ("NYSP") or Westchester County (N.Y.) officers and prosecutors -- regarding Wieland, Taddeo, Nicaj, Bashkim Mustafaj, Macchiarulo, Pereira and Ralph Pizzuti.  This request seeks, among other things, the substance of any statements given to law enforcement or prosecutors that were not memorialized in writing.

18

(2) All still-existing reports and rough notes,
and the substance of any statements given to law en-
forcement or prosecutors -- including those in
Westchester County -- regarding Perazzo.  Petitioners
also seek all evidence pertaining to the receipt,
viewing, retention and destruction of video surveil-
lance tapes of Perazzo's home.

(3) All information, including but not limited to
testimony, reports and notes, pertaining to cooperating
witness Sanginiti's cooperation with the WCDAO in the
prosecution of Roberto DeRosario.  Petitioners also
seek all FBI Form 302s, including drafts and notes of
each individual interview with Sanginiti.  Petitioners
additionally seek all phone records of telephone number
914-420-9773, subscribed in the name of Sanginiti's
wife, during the period of the Perazzo kidnapping from
June to July 2001.

(4) All information provided by the prosecution to
cooperating witness Celaj, his attorney, the Department
of Homeland Security or any other federal agency that
was provided for purposes of preventing Celaj's depor-
tation.  Petitioners also seek recordings of Celaj's
telephone calls from the Metropolitan Correctional

Center ("MCC") in Manhattan and Metropolitan Detention

Center ("MDC") in Brooklyn during the time of his

cooperation.  Petitioners additionally seek all notes

of Celaj's proffer sessions in Westchester, and all

documents and evidence reflecting contact between Celaj

and Perazzo's girlfriend, Kaffee Ann Forde, during the

time of Celaj's cooperation, including records of

commissary payments made by Forde for the benefit of

Celaj.

(5) All other Brady/Giglio evidence in possession

of the prosecution team, which includes the WCDAO or

the NYSP (DiPietro's Memorandum of Law in Support of

Discovery, dated October 4, 2010 ("DiPietro Discovery

Memo") (Docket Item 19 in 10 Civ. 199) at 6-14).[4]

---

[4]In his original motion, DiPietro also requested
"Westchester County notes, reports, and memorandums [sic]
relating to the interviews of . . . Marc Nicholson [sic]" and
"[c]orrectional recordings" of Sanginiti and "Grand jury
testimony, agreements, sentencing memorandums (including
Government letter sent by AUSA Treanor to the PSR), and notes
relating to Maurizio Sanginiti's cooperation with the Westchester
District Attorney's office and . . . sentencing benefits"
(DiPietro Motion for Discovery, dated July 23, 2010 (Docket Item
5 in 10 Civ. 2585) at 5).  However, DiPietro failed to provide
any explanation of why this discovery was appropriate in either
his discovery memo or his reply memo.  Thus, he has not set forth
"'specific allegations'" that give me "'reason to believe that
the petitioner may, if the facts are fully developed, be able to
demonstrate that he is . . . entitled to relief.'"  Bracy v.
(continued...)

DiPietro also requests an evidentiary hearing, although he does not specify what factual issues he seeks to have resolved at such a hearing (Affirmation of Counsel, attached to DiPietro Habeas Memo).

In addition to the discovery DiPietro seeks, Pizzuti requests the following discovery:

(1) The original wiretap application for Pizzuti's telephone number, 914-490-1007, prepared by the WCDAO in connection with the investigation of Perazzo.

(2) All notes, memoranda or other documents or records detailing the release of Celaj and Sanginiti from the MCC or MDC from April-July 2005, including the time and place of their release, and by and with whom they were transported.

(3) Grand jury testimony, notes, memoranda and documentation relating to Perazzo and any interviews of Perazzo.

(4) All notes, memoranda or other documentation of any plea agreement proposal offered to Pizzuti.

---

(...continued)
Gramley, 520 U.S. 899, 908-09 (1997), quoting Harris v. Nelson, 394 U.S. 286, 300 (1969).  Because DiPietro has not shown good cause for discovery concerning Nickolson and Sanginiti, his request for this discovery is denied.

(5) All records and memoranda of the United States
Probation Department documenting Pereira's whereabouts
from April 26, 2005, to July 12, 2005 -- and if there
are no records, a statement to that effect.

(6) The files of a private investigation firm,
Innovative Strategists, Inc., hired by his former
attorneys (Pizzuti's Motion for Discovery, dated Sep-
tember 13, 2010 ("Pizzuti Discovery Memo") (Docket Item
330 in 02 Cr. 1237) at 3-6; Pizzuti's Supplemental
Discovery Request, dated September 24, 2010 ("Pizzuti
Supplemental Discovery Memo") (Docket Item 334 in 02
Cr. 1237), at 1-3).

Pizzuti also requests an evidentiary hearing, although
he does not specify what factual issues he seeks to have resolved
at the hearing.  In fact, Pizzuti contends that "discovery is
necessary to further develop Petitioner's claims, and to limn
[sic] the need for an evidentiary hearing" (Pizzuti Discovery
Memo at 2).

22

III.  <u>Analysis</u>

    A.  Legal Standard for
        <u>Discovery for Habeas Petitioners</u>

       "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." <u>Bracy v. Gramley</u>, <u>supra</u>, 520 U.S. at 904; <u>Harris v. Nelson</u>, <u>supra</u>, 394 U.S. at 295; <u>accord</u> <u>Charles v. Artuz</u>, 21 F. Supp. 2d 168, 169 (E.D.N.Y. 1998).  The Second Circuit has noted that "Rule 6(a) of the Rules Governing Section 2255 Proceedings . . . provides that a § 2255 petitioner is entitled to undertake discovery only when 'the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.'" <u>Lewal v. United States</u>, 152 F.3d 919, 1998 WL 425877 at *2 (2d Cir. 1998) (unpublished).

           A petitioner "bears a heavy burden in establishing a right to discovery." <u>Renis v. Thomas</u>, No. 02 Civ. 9256 (DAB)(RLE), 2003 WL 22358799, at *2 (S.D.N.Y. Oct. 16, 2003) (citing <u>Bracy</u>, 520 U.S. at 904).  In order to show "good cause," a petitioner must present "'specific allegations"' that give the Court "'reason to believe that the petitioner may, if the facts are fully devel-oped, be able to demonstrate that he is . . . entitled to relief."'  <u>Bracy</u>, 520 U.S. at 908-09 (quoting <u>Harris v. Nelson</u>, 394 U.S. 286, 300 (1969)).  A court may deny a petitioner's request for discovery "where the peti-tioner provides no specific evidence that the requested discovery would support his habeas corpus petition." <u>Hirschfeld v. Comm'r of the Div. of Parole</u>, 215 F.R.D. 464, 465 (S.D.N.Y. 2003); <u>see</u> <u>also</u> <u>Charles v. Artuz</u>, 21 F. Supp. 2d 168, 170 (E.D.N.Y. 1998).  Generalized

23

> statements regarding the possibility of the existence of discoverable material will not be sufficient to establish the requisite "good cause."  See Gonzalez v. Bennett, No. 00 Civ. 8401(VM), 2001 WL 1537553, at *4 (S.D.N.Y. Nov. 30, 2001); Green v. Artuz, 990 F. Supp. 267, 271 (S.D.N.Y. 1998); Munoz v. Keane, 777 F. Supp. 282, 287 (S.D.N.Y. 1991), aff'd sub nom., Linares v. Senkowski, 964 F.2d 1295 (2d Cir.1992).

Ruine v. Walsh, 00 Civ. 3798 (RWS), 2005 WL 1668855 at *6 (S.D.N.Y. July 14, 2005) (Sweet, D.J.).

Furthermore, "Rule 6 does not license a petitioner to engage in a 'fishing expedition' by seeking documents 'merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error.'"  Ruine v. Walsh, supra, 2005 WL 1668855 at *6, quoting Charles v. Artuz, 21 F. Supp. 2d 168, 169 (E.D.N.Y. 1998).

A habeas petitioner seeking an evidentiary hearing must also meet a demanding standard.

> A petition for habeas corpus requires a hearing to resolve disputed issues of fact unless the record shows that the petitioner is not entitled to relief.  28 U.S.C. § 2255.  We have consistently held that the standard to be used in making this determination is whether, "if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief.  Mere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself.  The petitioner must set forth specific facts which he is in a position to establish by competent evidence."  Dalli v. United States, 491 F.2d 758, 760-61 (2d Cir. 1974) (citations omitted).

> See also United States v. Franzese, 525 F.2d 27, 31 (2d
> Cir. 1975), cert. denied, 424 U.S. 921, 96 S.Ct. 1128,
> 47 L.Ed.2d 328 (1976); D'Ercole v. United States, 361
> F.2d 211, 212 (2d Cir.) (per curiam), cert. denied, 385
> U.S. 995, 87 S.Ct. 610, 17 L.Ed.2d 454 (1966).

Hayden v. United States, 814 F.2d 888, 892 (2d Cir. 1987); accord

LoCascio v. United States, 395 F.3d 51, 57 (2d Cir. 2005).  A

court "enjoys 'broad discretion to hear further evidence in

habeas cases.'"  Beatty v. Greiner, 50 F. App'x 494, 497 (2d Cir.

2002), quoting Nieblas v. Smith, 204 F.3d 29, 31 (2d Cir. 1999).


   B.  Standards for Attacking
       Conviction Due to Brady Violation


        The standards applicable to a collateral attack on a

conviction based on a putative Brady violation were succinctly

set forth by the Honorable Lewis A. Kaplan, United States Dis-

trict Judge, in Lamberti v. United States, 22 F. Supp. 2d 60, 66-

67 (S.D.N.Y. 1998), aff'd without published opinion sub nom.,

Badalamenti v. United States, 201 F.3d 430 (2d Cir. 1999):

> In order to establish a Brady v. Maryland viola-
> tion, the defendant must show that (1) the government
> suppressed favorable evidence, and (2) the evidence the
> government suppressed was material.  A defendant cannot
> satisfy the suppression requirement if the defendant,
> directly or through counsel, "either knew, or should
> have known, of the essential facts permitting him to
> take advantage of [that] evidence."  As for the materi-
> ality requirement, "favorable evidence is material, and
> constitutional error results from its suppression by
> the government, if there is a reasonable probability
> that, had the evidence been disclosed to the defense,

> the result of the proceeding would have been differ-
> ent."  "A 'reasonable probability' is 'a probability
> sufficient to undermine confidence in the outcome' of
> the case."

(footnotes and citations omitted).  <u>See</u> <u>also</u> <u>Banks v. Dretke</u>, 540

U.S. 668, 691 (2004); <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82

(1999); <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 250-51 (2d Cir.

1998); <u>Leake v. Senkowski</u>, 01 Civ. 7559 (SHS)(GWG),

2004 WL 1464889 at *19 (S.D.N.Y. June 30, 2004) (Gorenstein,

M.J.) (Report & Recommendation).

     In <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985),

the United States Supreme Court established a universal defini-

tion of materiality for <u>Brady</u> purposes to be applied whether or

not defense counsel requested the material in issue in discovery:

"[E]vidence is material only if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different.  A 'reasonable

probability' is a probability sufficient to undermine confidence

in the outcome."  473 U.S. at 682; <u>see</u> <u>also</u> <u>Kyles v. Whitley</u>, 514

U.S. 419, 433-34 (1995).

> While the definition of <u>Bagley</u> materiality in terms of
> the cumulative effect of suppression must accordingly
> be seen as leaving the government with a degree of
> discretion, it must also be understood as imposing a
> corresponding burden.  On the one side, showing that
> the prosecution knew of an item of favorable evidence
> unknown to the defense does not amount to a <u>Brady</u>
> violation, without more.  But the prosecution, which

26

alone can know what is undisclosed, must be assigned
the consequent responsibility to gauge the likely net
effect of all such evidence and make disclosure when
the point of "reasonable probability" is reached.

Kyles v. Whitley, supra, 514 U.S. at 437.

Similarly, under Giglio v. United States, 405 U.S. 150,
154 (1972), where reliability of a witness could determine guilt
or innocence, "nondisclosure of evidence affecting credibility
falls within" the general Brady rule "that suppression of mate-
rial evidence justifies a new trial 'irrespective of the good
faith or bad faith of the prosecution.'"

     C.  Standards for Finding
           that a Section 2255 Claim
           Is Procedurally Barred

"A § 2255 petition may not be used as a substitute for
direct appeal." Marone v. United States, 10 F.3d 65, 67 (2d Cir.
1993) (per curiam), citing United States v. Frady, 456 U.S. 152,
165 (1982). Accordingly, where, as here, a federal prisoner
attempts to use Section 2255 to assert a claim that was not
raised on direct appeal but which could have been so raised, the
claim will be procedurally barred unless the prisoner shows cause
for failing to raise the claims on direct appeal and prejudice
therefrom.

A party who fails to raise an issue on direct
appeal and subsequently endeavors to litigate the issue

> via a § 2255 petition must "show that there was cause
> for failing to raise the issue, and prejudice resulting
> therefrom." Douglas v. United States, 13 F.3d 43, 46
> (2d Cir. 1993) (citing Campino v. United States, 968
> F.2d 187, 190 (2d Cir. 1992)). . . . "The Supreme Court
> has stated that '"cause" . . . must be something exter-
> nal to the petitioner, something that cannot be fairly
> attributed to him.'" Marone v. United States, 10 F.3d
> 65, 67 (2d Cir. 1993) (quoting Coleman v. Thompson, 501
> U.S. 722, 753, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640
> (1991)) (emphasis in Coleman).

United States v. Pipitone, 67 F.3d 34, 38 (2d Cir. 1995); accord

Mui v. United States, 614 F.3d 50, 54 (2d Cir. 2010) ("A second

rule that applies in the Section 2255 context prevents claims

that could have been brought on direct appeal from being raised

on collateral review absent cause and prejudice."); Campino v.

United States, 968 F.2d 187, 190 (2d Cir. 1992) ("[F]ailure to

raise a claim on direct appeal is itself a default of normal

appellate procedure, which a defendant can overcome only by

showing cause and prejudice.").

In addition, a Section 2255 motion cannot be used as a

vehicle to relitigate claims that were actually raised and

decided on direct appeal. Reese v. United States, 329 F. App'x

324, 326 (2d Cir. 2009), cert. denied, 130 S. Ct. 1537 (2010);

United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (per

curiam); United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001)

(per curiam); see also United States v. Natelli, 553 F.2d 5, 7

(2d Cir. 1977) (per curiam); Gotti v. United States, 622 F. Supp.

2d 87, 92 (S.D.N.Y. 2009) (Baer, D.J.) ("It is well-settled that a petition for habeas corpus may not provide a second bite at the apple, i.e., another chance to raise issues that were or could have been raised on appeal.").  However, the Second Circuit has indicated a preference for adjudicating claims on the merits. Gotti v. United States, supra, 622 F. Supp. 2d at 94.

        D.  Application of the Foregoing
           Principles to Petitioners' Motions

           1.  DiPietro's Discovery
               Requests Relating to Claims
               that Are Procedurally Barred

      Six of DiPietro's discovery requests relate to claims that are procedurally barred.  As explained above, while DiPietro could overcome the procedural bar if he were to show either cause and prejudice or that a failure to consider the merits of the claim would result in a fundamental miscarriage of justice, Walden v. United States, 63 F. App'x 568, 569 (2d Cir. 2003); Roccisano v. Menifee, 293 F.3d 51, 61 (2d Cir. 2002), he has not made such a showing with respect to any of these six requests. To the contrary, his papers do not even squarely address the issue of procedural bar, and he does not explain why he failed to seek relief on direct appeal concerning these claims.

a.  Requests Concerning
Potential Witnesses
Ralph Pizzuti,
Carl Macchiarulo
& Manny Pereira

DiPietro requests all investigative reports and rough
notes of the FBI or prosecutors' contacts or meetings -- includ-
ing the substance of any oral statements given to law enforce-
ment/prosecutors that were not memorialized in writing -- with
Ralph Pizzuti, Carl Macchiarulo and Manny Pereira.  The govern-
ment argues that it complied with its Brady obligations regarding
Ralph Pizzuti, Macchiarulo and Pereira by informing petitioners
before trial that these men had spoken with the FBI and alerting
all defense counsel they may wish to speak them.

On February 23, 2005, the United States Attorney's
Office sent a letter to all defense counsel identifying Ralph
Pizzuti (and Taddeo) pursuant to its obligations under Brady (Tab
8 in Ex. A, attached to DiPietro Habeas Memo).  On April 15,
2005, the United States Attorney's Office sent a similar letter
to all defense counsel identifying Macchiarulo and Pereira
pursuant to its Brady obligations (Tab 8 in Ex. A, attached to
DiPietro Habeas Memo).  In these letters, the government repre-
sented that Ralph Pizzuti, Macchiarulo and Pereira claimed they
were "present during the specific events charged in Counts Five

30

through Nine of the above-referenced superseding indictment,"
that Ralph Pizzuti "did not see anyone threaten the victim" and
that "Macchiarulo and Pereira . . . did not see anyone carry a
firearm or threaten the victim" (Tab 8 in Ex. A, attached to
DiPietro Habeas Memo).

In both the February 23, 2005, letter regarding Ralph
Pizzuti and the April 15, 2005, letter regarding Macchiarulo and
Pereira, the government notified all defense counsel that "[f]rom
the outset, we want to be clear that, although the information
provided by these witnesses arguably constitutes Brady material,
under the circumstances of this case, the Government does not
believe that these witnesses were truthful during the interviews"
(Tab 8 in Ex. A, attached to DiPietro Habeas Memo).

Ralph Pizzuti, Macchiarulo and Pereira all told the FBI
that they were present at Perazzo's house on July 9, 2001, when
some of the charged events took place, and the United States
Attorney's Office conveyed this information to defense counsel.
Thus, the defendants had notice of the potentially exculpatory
testimony these witnesses might have offered.  The government
additionally stated that Ralph Pizzuti was petitioner Pizzuti's
brother, that Macchiarulo and Pereira were believed to be close
associates of petitioner Pizzuti, and that counsel for Pizzuti
knew how to contact them (Tab 8 in Ex. A, attached to DiPietro

31

Habeas Memo).  Moreover, "Macchiarulo told the FBI that he had spoken with a private investigator in February 2005 (although it was not reported who retained this investigator), and that he was served with a trial subpoena in June 2005 by defendant Pizzuti's lawyer, David Holland" (Memorandum of Law of the United States of America in Opposition to Motions of Angelo DiPietro, Michael Pizzuti and Joseph Genua under 28 U.S.C. § 2255 and in Opposition to DiPietro's Motion for Discovery ("Gov't Opp. Memo"), dated July 30, 2010 (Docket Item 9 in 10 Civ. 199), at 39 n.12). Pereira told the FBI that he was close with the Pizzuti brothers and spoke to Ralph Pizzuti a few days before the FBI spoke with Pereira in April 2005 (Gov't Opp. Memo at 39 n.12).

DiPietro argues that the notes and reports of these interviews were never produced and that a mere apprisal that witnesses may possess exculpatory evidence does not fulfill the prosecution's obligations under Brady (DiPietro Discovery Memo at 13-14).  I conclude that this argument could have been raised on direct appeal and, therefore, it is procedurally barred.  Marone v. United States, supra, 10 F.3d at 67.  DiPietro was aware that the prosecution interviewed these potential witnesses well before trial and that they had potentially exculpatory information, and he offers no new facts which would explain his failure to raise a

32

claim on direct appeal concerning the sufficiency of the prosecu-
tion's disclosure.

          b.  The Perazzo
             Surveillance Videotapes

      DiPietro and Pizzuti request all evidence pertaining to
the receipt, viewing, retention and destruction of video surveil-
lance tapes of Perazzo's home; these tapes were putatively
generated by Perazzo's home security system. According to
DiPietro, Perazzo's home surveillance tapes recorded the events
in June and July 2001, when the charged activity took place
(DiPietro Discovery Memo at 9, citing Ex. E). The tapes were
never found and are believed by the prosecution to have been
destroyed (DiPietro Discovery Memo at 9; Memorandum of Law of the
United States of America in Opposition to Motions of Angelo
DiPietro and Michael Pizzuti for Discovery in a § 2255 Proceeding
("Memo in Opp. to Discovery"), dated November 3, 2010 (Docket
Item 21 in 10 Civ. 199), at 15). The government argues that the
status of these missing videotapes was litigated both at trial
and on appeal, and that DiPietro and Pizzuti now seek another
opportunity to litigate their existence and/or the facts sur-
rounding their destruction (Memo in Opp. to Discovery at 15).

      Prosecutors recovered 64 videotapes from Perazzo's

house, most of which contained pornography (Memo in Opp. to
Discovery at 15).   These were viewed and destroyed by the WCDAO.
However, law enforcement also recovered two videotapes from
Perazzo's security system for which they could not subsequently
account (Tr. 3182, 3266, 5033, 5040, 5099).   Cross-examination of
one WCDAO investigator established that these security tapes were
not turned over to the FBI or the United States Attorney's Office
and that an extensive but unsuccessful search that lasted two to
three days was conducted during the trial when the issue of the
missing tapes was first raised by the defense (Tr. 5038-40, 5095-
5102).   Furthermore, testimony at trial established that no
reports, memoranda or other documents were prepared concerning
the efforts made to locate the tapes or to establish that the
tapes were destroyed (Tr. 5098-5100).

It appears that the circumstances surrounding the
destruction of the tapes was fully explored at trial and the
inferences to be drawn from their loss was argued to the jury.
In their rebuttal summation, the prosecution stated, "I want to
address the two tapes that [defense counsel] raised repeatedly.
I have to say I wish we had them here for you, but I'm confident
that there was nothing on those tapes for you to see and that
they were innocently destroyed" (Tr. 6453).   Defense counsel
objected but was overruled (Tr. 6453).   On appeal, DiPietro and

34

Pizzuti's co-defendant, Genua, argued that the statement was "impermissibly prejudicial." United States v. Genua, supra, 274 F. App'x at 55.  The Second Circuit held that Genua had not demonstrated reversible error.  274 F. App'x at 55.

I conclude that the sufficiency of the government's Brady disclosures with respect to the tapes could have been raised on direct appeal and is, therefore, procedurally barred. Marone v. United States, supra, 10 F.3d at 67.  Petitioners are not entitled to "a second bite at the apple."  Gotti v. United States, supra, 622 F. Supp. 2d at 92.  Although they clearly felt the prosecution's production was insufficient in this respect, petitioners offer no explanation why they did not raise this argument on appeal.[5]

### c. Sanginiti's Cooperation in the Roberto DeRosario case

DiPietro requests putative Brady material with respect to Sanginiti's cooperation with the WCDAO in the unrelated state

---

[5]Furthermore, even if I were to address the merits of petitioners' request, I would decline to order discovery. Although the loss of the surveillance videotapes is troubling, there does not appear to be any discovery issue here.  Because the tapes no longer exist, I cannot order their production. Petitioners have simply failed to show that there is any further existing evidence concerning the surveillance videotapes and there is, therefore, no further discovery to be ordered.

prosecution of Roberto DeRosario.  Sanginiti assisted in an
investigation of the sexual assault and murder of a 12-year-old
child.  Prior to the formation of a cooperation agreement between
the United States Attorney's Office and Sanginiti with respect to
the charges against petitioners, state authorities contacted the
United States Attorney's Office because a charged defendant in
the assault/murder case -- Roberto DeRosario -- was a high-school
classmate of Sanginiti (Tr. 1797-98; DiPietro Discovery Memo at
10).  Sanginiti did not have knowledge of any facts specific to
that case because the alleged assault and murder had taken place
many years after Sanginiti last saw DeRosario (Memo in Opp. to
Discovery at 18).  However, the victim's body was found in a
location that Sanginiti and DeRosario formerly frequented many
years earlier (Memo in Opp. to Discovery at 19).  Thus, Sanginiti
could testify that DeRosario was familiar with the location where
the murder victim was found (Memo in Opp. to Discovery at 18-19,
citing Tr. 1797-99).

        Sanginiti's federal cooperation agreement had not yet
been finalized when the state authorities sought his testimony
before a grand jury concerning DeRosario.[6]  The United States

_____

        [6]Sanginiti was charged in an information with conspiracy to
commit extortion, attempted extortion, use of a firearm in
relation to a crime of violence, conspiracy to commit robbery, a
                                        (continued...)

Attorney's Office took the position and advised Sanginiti's
counsel that Sanginiti would receive no benefit in the federal
case for his cooperation against DeRosario (Memo in Opp. to
Discovery at 19, <u>citing</u> Tr. 1797-99).  DiPietro and his co-
defendants were given this letter as part of Sanginiti's <u>Jencks</u>
<u>Act</u> materials (Gov't Opp. Memo at 56, <u>citing</u> 3518-G).  Sanginiti
did testify in the grand jury against DeRosario, and Judge Kram
ruled at trial that Sanginiti could not be impeached or otherwise
cross-examined concerning DeRosario (Tr. 1797-99).  DiPietro
could have appealed Judge Kram's ruling concerning Sanginiti to
the Second Circuit, but did not.  Therefore, DiPietro is proce-
durally barred from raising the issue here and discovery related
to the issue is, therefore, irrelevant.  <u>Marone v. United States</u>,
<u>supra</u>, 10 F.3d at 67.

            d.  Discovery Request for
                <u>Telephone Number 914-420-9773</u>

DiPietro requests all phone records pertaining to
telephone number 914-420-9773, subscribed in the name of
Sanginiti's wife, during the period of the Perazzo kidnapping

_____

(...continued)
gambling conspiracy and making false statements (Docket Items
313-14).  As a result of his cooperation against petitioners and
others, he was sentenced to time served (Ex. E, attached to
DiPietro Habeas Memo, at 9).

from June to July 2001.  This discovery request stems from
DiPietro's belief that

> Sanginiti actually used this telephone during the time
> of the alleged kidnapping, not his own phone, for which
> records were proffered.  The records sought will re-
> flect that calls were made between Sanginiti and Frank
> Taddeo during the time that Sanginiti had testified
> they were together in the same vehicle kidnapping
> Perazzo.  The existence of calls between the two during
> this time would have substantially undercut Sanginiti's
> testimony.

(DiPietro Discovery Memo at 10).  DiPietro makes a generalized,
conclusory statement that "[t]he Government had a duty to dis-
close key phone records within its possession" (Reply Memorandum
("DiPietro Discovery Reply Memo"), dated November 18, 2010
(Docket Item 24 in 10 Civ. 199) at 5), but he offers no specific
evidence that the prosecution actually possessed telephone
records for 914-420-9773.

        This is another argument that could have been raised on
appeal and is, therefore, procedurally barred.  The truthfulness
of Sanginiti's testimony that he and Taddeo were, in fact,
together in a vehicle during Perazzo's kidnapping was contested
at trial, including through telephone records of Taddeo.
Sanginiti was cross-examined on this issue.  When the defense
argued that phone records would support its contention that
Taddeo and Sanginiti were not in the same vehicle, the prosecu-
tion obtained and disclosed Taddeo's telephone records (Memo in

38

Opp. to Discovery at 17, citing Tr. 4198-4202; Tab 9 of Ex. A, annexed to DiPietro Habeas Memo). There is no evidence whatsoever that the government suppressed the records of 914-420-9773, nor does the record disclose that there was any impediment to DiPietro's attorney subpoenaing these records himself. However, to the extent that DiPietro believed the prosecution possessed these records, his recourse was to contest the sufficiency of the prosecution's production of Brady material on direct appeal. He is not entitled to "a second bite at the apple." Gotti v. United States, supra, 622 F. Supp. 2d at 92.

     e.  Recordings of Celaj's Telephone
        Calls During His Incarceration

     DiPietro next seeks recordings of Celaj speaking on the telephone from the MCC and MDC during the time he was cooperating. DiPietro asserts that the recordings contained evidence of Celaj's continuing involvement in criminal activity despite his status as a cooperator, which constituted valid impeachment evidence and showed "the prosecution's willingness to look the other way" (DiPietro Discovery Memo at 12).

     As an example, DiPietro refers to calls between Celaj and Bashkim Mustafaj during the time of Celaj's detention at the MCC; FBI Special Agent Rico Falsone subsequently listened to a

recording of some calls (Tr. 5976-77, attached as Ex. G to DiPietro Discovery Memo), although the record does not disclose the content of the calls.  Defense counsel subpoenaed these and other recordings during trial, but the subpoena was quashed on the prosecution's motion (DiPietro Discovery Memo at 12).  DiPietro claims that the prosecution falsely represented that the prison's staff attorney sought to quash the subpoena because it was 'unduly burdensome'" (DiPietro Discovery Memo at 12).[7]

Because DiPietro could have contested this ruling on direct appeal, he is procedurally barred from raising the issue here.  Marone v. United States, supra, 10 F.3d at 67.  If DiPietro objected to the quashing of the subpoena, the time to challenge such a ruling was on appeal.  This is another clear attempt by DiPietro to get "a second bite at the apple."  Gotti v. United States, supra, 622 F. Supp. 2d at 92.

---

[7]In support of his argument, DiPietro submits an affidavit of a private investigator who interviewed attorney Adam Johnson -- a former employee of the counsel's office of the Manhattan Correctional Center -- following DiPietro's conviction and appeal (Appendix, annexed to DiPietro Motion for New Trial, at A280-81; Tr. 1239).  Johnson had no recollection of the subpoena, but when the subpoena was read to him, he allegedly told the investigator that "he did not feel this subpoena would be considered in the category of unduly burdensome" (Appendix at A280-81).  Because DiPietro puts forth nothing more than hearsay with respect to Johnson and because there is no explanation as to why Johnson's testimony was not procured at an earlier date, I conclude that this affidavit does not establish good cause to order discovery.

40

f.  Discovery Request for
    Commissary Payments by
    Kaffee Ann Forde for Celaj

DiPietro also seeks all documents and evidence reflect-
ing contact between Celaj and Perazzo's girlfriend, Kaffee Ann
Forde, during the period of Celaj's cooperation, including
records of commissary payments from Forde for the benefit of
Celaj.  DiPietro claims, without support, that these payments
"were derived from law enforcement funds and were thus another
undisclosed Giglio benefit" (DiPietro Discovery Memo at 13).  The
government represents that it has produced documents of commis-
sary payments at Bates number D1-006486 on June 13, 2005 (Memo in
Opp. to Discovery at 23), and DiPietro does not contest this
representation in his reply brief.  To the extent that he did not
believe that the government's production was sufficient under its
Brady obligations, DiPietro could have raised the issue on direct
appeal.  Thus, his claim here is also procedurally barred.
Marone v. United States, supra, 10 F.3d at 67.[8]

_____

    [8]With respect to DiPietro's request for discovery concerning
other contact between Celaj and Forde that may not be
procedurally barred, DiPietro has not put forth "specific
allegations" that give the Court "reason to believe that the
petitioner may, if the facts are fully developed, be able to
demonstrate that he is . . . entitled to relief."  Bracy v.
Gramley, supra, 520 U.S. at 908-09, quoting Harris v. Nelson,
                                              (continued...)

2.   Pizzuti's Discovery
     Requests Relating to Claims
     that Are Procedurally Barred

Pizzuti also requests discovery concerning claims that
are procedurally barred.  Pizzuti requests all notes, memoranda
or other documents or records detailing the release of Sanginiti
and Celaj from the MCC or MDC from April-July 2005, including the
time and place of their release, and by and with whom they were
transported.  This request is procedurally barred.

Pizzuti asserts that

[a]lthough the government represented and stipulated
during Petitioner's trial that Sanginiti was indeed
taken out of prison just one time in 2004, Sanginiti
nevertheless denied ever being released from incarcera-
tion for any reason from the time of his arrest in
February 2004 despite sealed orders allowing release
issued by Judge Kram on April 22, 2005 (DE: 305) and
despite the fact that counsel for Angelo DiPietro had
information from people who claimed to have observed
Maurizio Sanginiti on Arthur Avenue in the Bronx during
the period of Petitioner's trial.

(Motion for Discovery at 5).  It appears -- construing Pizzuti's
claim broadly -- that he is arguing that the government failed to
turn over records that could have been used to impeach a witness,

_____

(...continued)
supra, 394 U.S. at 300 (internal quotation marks omitted).  In
fact, he makes no argument whatsoever as to why documents other
than commissary payments are relevant to his claim.  Therefore,
no discovery is warranted here, either, because DiPietro has not
shown good cause.

in violation of Giglio.  However, I conclude that this argument could have been raised on appeal and, therefore, is procedurally barred.  Marone v. United States, supra, 10 F.3d at 67.  Pizzuti was aware, at trial, of both the government's stipulation that Sanginiti was removed from prison as well as Sanginiti's testimony that he was not removed.  Pizzuti offers no new facts which would explain his failure to raise a claim on direct appeal concerning the sufficiency of the government's production pursuant to its Brady/Giglio obligations.

Pizzuti cannot overcome the procedural bar because he has not shown either cause and prejudice or that a failure to consider the merits of the claim would result in a fundamental miscarriage of justice.  Walden v. United States, supra, 63 F. App'x at 569; Roccisano v. Menifee, supra, 293 F.3d at 61.  He offers no evidence as to why he did not raise this issue before the Second Circuit.  There is nothing showing cause, never mind prejudice, as to why Pizzuti did not challenge the sufficiency of the government's Brady/Giglio disclosures with respect to this issue.  Nor does Pizzuti make any showing that a failure to consider this issue would result in a fundamental miscarriage of justice.

While Pizzuti never explains why he requests Celaj's records, I assume that he also considers this evidence to be

43

impeachment material under <u>Giglio</u>.  Again, I conclude that this argument could have been raised on direct appeal and, therefore, it is procedurally barred.  Pizzuti knew of Celaj's incarceration before trial, as his co-defendant received requested documents concerning commissary payments for Celaj.  The time period for which Pizzuti requests records is April-July 2005, coinciding with Pizzuti's trial.  Pizzuti offers no new facts which would explain his failure to raise a claim on direct appeal concerning the sufficiency of the government's production with respect to Celaj pursuant to its <u>Brady/Giglio</u> obligations.

Nor can Pizzuti overcome the procedural bar.  He does not explain why he did not raise this issue on direct appeal.  Pizzuti offers no new facts explaining the delay in pressing his claim, nor does he offer any facts establish prejudice.  Finally, Pizzuti does not even attempt to make a showing that a failure to consider this issue would result in a fundamental miscarriage of justice.

3.   DiPietro's Remaining Claims

a.   Potential witnesses

I.   Richard Wieland

DiPietro requests all investigative reports and rough
notes of the FBI or prosecutors' contacts or meetings -- includ-
ing the substance of any oral statements given to law enforce-
ment/prosecutors that were not memorialized in writing -- with
Wieland.  DiPietro argues that Wieland made exculpatory state-
ments to government agents which were not disclosed, which
DiPietro learned about when Wieland spoke with DiPietro's private
investigator on April 24, 2010 (Clutter Memorandum of Interview,
attached as Ex. B to DiPietro Discovery Memo).  The government
argues that Wieland never made exculpatory statements relating to
DiPietro or Pizzuti, and, therefore, it had no obligations under
Brady to disclose anything regarding Wieland.

DiPietro claims that the transcript of Wieland's
interview was not available to defense counsel during his trial.
The prosecution asserts that although it did not identify Wieland
as a potential witness until the middle of the trial -- when the
FBI learned Wieland's identity while inspecting bank records --
defendants knew Wieland was a potential witness well before then

45

(Memo in Opp. to Discovery at 7).  DiPietro acknowledges that
Wieland was present with Perazzo on June 29, 2001, the night of
the events that gave rise to some of DiPietro's convictions
(DiPietro Discovery Memo at 6).  The government claims it did not
know how to spell Wieland's last name -- regularly spelling it
"Whalen" -- and at trial used a silhouette on its photo board
instead of a photograph while describing the people involved in
the Perazzo kidnapping.  Upon learning Wieland's identity, FBI
agents briefly interviewed him by telephone on June 20, 2005.

     According to the government, Wieland told the FBI "that
he refused to testify and that he would disappear if anyone tried
to contact him, insisted that he and Frank Taddeo had no involve-
ment in the matter in any way, and said that he could not believe
what he heard about the testimony of Government witness Maurizio
Sanginiti" (Memo in Opp. to Discovery at 8, citing Falsone Aff.
at ¶ 3(c), attached as Ex. 1).  The government claims it did not
possess any information whatsoever from Wieland until the trial
was near its conclusion, and it claims Wieland never provided any
information exculpating DiPietro or Pizzuti (Memo in Opp. to
Discovery at 8-9).

     DiPietro's attorney submits a signed, hand-written,
notarized statement from Wieland attached to a letter to the
undersigned, dated August 20, 2010.  In that statement, Wieland

46

does not refute the FBI's description of his 2005 phone inter-
view.  Also, DiPietro's counsel cannot adequately explain why --
if no kidnapping occurred on June 29, 2001, as Wieland now
contends -- Wieland was not called to testify.  DiPietro acknowl-
edges Wieland's presence with Perazzo on the date in question.

I conclude that DiPietro "provides no specific evidence
that the requested discovery would support his habeas corpus
petition." Ruine v. Walsh, supra, 2005 WL 1668855 at *6, quoting
Hirschfeld v. Comm'r of the Div. of Parole, 215 F.R.D. 464, 465
(S.D.N.Y. 2003) (Ellis, M.J.) (internal quotations omitted).
During his conversation with the FBI, Wieland merely claimed that
he and Taddeo were not involved.  Furthermore, Wieland's comment
about Sanginiti's testimony is not specific enough to be con-
strued as exculpatory pursuant to Brady.  Wieland's notarized
statement in 2010 does not challenge the FBI's characterization
of his 2005 interview.  Because there is no showing of good
cause, DiPietro is not entitled to discovery concerning Wieland.

ii.  Frank Taddeo

DiPietro next requests all investigative reports and
rough notes of the FBI or prosecutors' contacts or meetings --
including the substance of any oral statements given to law
enforcement/prosecutors that were not memorialized in writing --

47

with Taddeo.  DiPietro acknowledges that Taddeo was present with
Perazzo on June 29, 2001, the night of the charged events, but
argues that Taddeo specifically denied that Perazzo had been
kidnapped (DiPietro Discovery Memo at 7).  DiPietro further
argues that

> the recently-obtained attorney's notes of Taddeo's
> proffer sessions reflect that, contrary to the prosecu-
> tion's representations to the Court and counsel at
> trial, Taddeo in no way implicated DiPietro in kidnap-
> ping and did not provide any evidence corroborating
> prosecution phone record evidence.  Had FBI 302 re-
> ports, notes of the proffers, and the complete sub-
> stance of Taddeo's exculpatory statements been produced
> before trial, instead of only a letter suggesting
> Taddeo may possess Brady material, DiPietro would have
> been able to follow reasonable investigative leads and
> to fairly and intelligently decide whether or not to
> call Taddeo as a witness in light of his prior state-
> ments to the government, as memorialized by the prose-
> cution team.

(DiPietro Discovery Memo at 7).[9]

DiPietro further alleges that in arguing against the
production of Taddeo's conversations with the FBI, the government
falsely represented that Taddeo's proffer statements corroborated
Sanginiti's kidnapping testimony in material respects and were

---

[9]DiPietro does not explain when or how these "recently-
obtained attorney's notes" were obtained or fully explain why
this argument could not be raised on direct appeal.
Nevertheless, I shall address the merits of this claim because of
the Second Circuit's preference to adjudicate claims on the
merits.  Gotti v. United States, supra, 622 F. Supp. 2d at 94.

supported by telephone records of June 29, 2001 (DiPietro Discovery Memo at 8).

DiPietro concedes that the prosecution informed defendants before trial that Taddeo may have exculpatory information and that they may wish to interview him (Memo in Opp. to Discovery at 10; see also Tab 8 at Ex. A, attached to DiPietro Habeas Memo). The government points out that DiPietro apparently pursued this lead because in June 2005, Taddeo told the FBI that he met twice with DiPietro's counsel prior to trial (Memo in Opp. to Discovery at 10, citing Falsone Aff. at ¶ 3(d), attached as Ex. 1). Thus, not only did the government meet its obligations in alerting the defense that Taddeo could provide exculpatory testimony, but defense counsel actually followed up by speaking with Taddeo twice. Defense counsel made a knowing and informed decision regarding how useful Taddeo's testimony would (or would not) be. Therefore, there can be no cognizable Brady claim here, and, hence, there is no good cause to order discovery with respect to Taddeo. See United States v. Grossman, supra, 843 F.2d 78, 85 (2d Cir. 1988) ("Brady does not require the government to turn over exculpatory evidence if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." (citation and internal quotation marks omitted)).

49

Furthermore, while DiPietro claims that the government misled the court and opposing counsel that Taddeo's proffer corroborated Sanginiti's testimony regarding the alleged kidnapping, this relates to DiPietro's argument concerning the usage of the telephone number 914-420-9773 -- which was subscribed in the name of Sanginiti's wife -- that I have already addressed, <u>supra</u>. DiPietro has not established good cause through specific evidence to show that the requested discovery with respect to Taddeo would support his Section 2255 petition.   Therefore, discovery is denied.[10]

### iii.   <u>Ded Nicaj</u>

DiPietro also requests all investigative reports and rough notes of the FBI or prosecutors' contacts or meetings --

---

[10]On December 20, 2010 and December 23, 2010, the undersigned received unsworn letters claiming to be from Wieland and Taddeo, respectively.  In these letters, both men allege perjury and government misconduct, but neither gives a viable reason for their failure to testify at trial.  Because these are unsworn letters, I afford them no weight.

Additionally, DiPietro submitted a memorandum of his private investigator's interview with Taddeo on November 21, 2009, where Taddeo denied Perazzo was kidnapped (Clutter Memorandum of Interview, attached as Tab 6 at Exhibit A to DiPietro Habeas Memo).  DiPietro also submitted an affidavit from Taddeo swearing that the statements he made to the investigator are true (Ex. 3, attached to DiPietro Discovery Memo).  However, this does not change the analysis, because Taddeo was available to testify and there is no sufficient explanation for why he was not called.

including the substance of any oral statements given to law
enforcement/prosecutors that were not memorialized in writing --
with Nicaj.  This request includes statements given to
Westchester County officers and prosecutors that participated in
the prosecution of DiPietro.

On November 11, 2009, Nicaj told DiPietro's private
investigator that DiPietro was innocent of the Eastchester
robbery for which DiPietro was convicted (Clutter Memorandum of
Interview, attached as Ex. D to DiPietro Discovery Memo).
DiPietro also claims that Nicaj told a third person, Marty
Vuksanaj, that the FBI interviewed Nicaj and that Nicaj told the
FBI that he did not know DiPietro and that DiPietro was not
involved in the Eastchester robbery (DiPietro Habeas Memo at 7,
citing Clutter Memorandum of Interview, attached as Tab 4 at Ex.
A).  DiPietro believes that Nicaj also made exculpatory state-
ments to members of the WCDAO or NYSP.

Despite these claims, DiPietro does not furnish an
affidavit from Nicaj or any first-hand evidence from him.  In
fact, although DiPietro's investigator attempted to set up a
meeting on November 20, 2009, with Nicaj (see Clutter Memorandum
of Interview, attached as Ex. D to DiPietro Discovery Memo),
DiPietro does not disclose whether the meeting took place and, if
so, what information Nicaj provided.  I infer from DiPietro's

sketchy disclosure that Nicaj has not provided any information that furthered DiPietro's claims.  Additionally, the FBI "has no record of an interview with Nicaj and the case agent recalls none" (Memo in Opp. to Discovery at 12, citing Falsone Aff. at ¶ 3(e), attached as Ex. 1).

Because DiPietro puts forth nothing more than hearsay with respect to Nicaj and the government has no records of any interview of Nicaj, I find that good cause has not been established.  The Second Circuit has held that hearsay statements will generally not entitle a habeas petitioner to an evidentiary hearing because "such hearsay would be inadmissible at the hearing itself." Hayden v. United States, 814 F.2d 888, 892 (2d Cir. 1987), quoting Dalli v. United States, 491 F.2d 758, 760 (2d Cir. 1974).  "[A] standard that would entitle a petitioner, based solely on hearsay information . . . to a full evidentiary hearing . . . would too easily lend itself to abuse, because such hearsay is too easily manufactured." Mulosmanaj v. Mazzuca, 06 Civ. 13515 (LBS), 2007 WL 2728739 at *5 (S.D.N.Y. Sept. 18, 2007) (Sand, D.J.), quoting Hayden v. United States, supra, 814 F.2d at 892.  Whether an application for discovery pursuant to Habeas Corpus Rule 6 is subject to the same standard as an evidentiary hearing appears to be an open question in the Second Circuit. See Ruine v. Walsh, supra, 2005 WL 1668855 at *6 n.4.  However,

the Seventh Circuit has held, with respect to the analogous statute for state prisoners, 28 U.S.C. § 2254, that "[w]hen expansion of the record is used to achieve the same end as an evidentiary hearing, the petitioner ought to be subject to the same constraints that would be imposed if he had sought an evidentiary hearing." Boyko v. Parke, 259 F.3d 781, 790 (7th Cir. 2001). At least two other Circuits are in agreement. See Ruine v. Walsh, supra, 2005 WL 1668855 at *6 n.4, citing Cargle v. Mullin, 317 F.3d 1196, 1209 (10th Cir. 2003), and Dorsey v. Chapman, 262 F.3d 1181, 1190 (11th Cir. 2001). While other courts have disagreed with these Circuits and at least one court in this district has declined to impose such a restriction against a Section 2254 petitioner, Ruine v. Walsh, 00 Civ. 3798 (RWS), 2005 WL 1668855 at *6 n.4, I find the reasoning of Boyko v. Parke, supra, 259 F.3d at 790, to be persuasive. I could not weigh hearsay testimony in an evidentiary hearing where petition-ers' goal would be to obtain discovery. Therefore, I decline to weigh such evidence where I am able to decide the motions on the submissions and where petitioners hope to achieve the same end. In any event, I conclude that the hearsay testimony offered in these motions, even if considered, does not establish "good cause." Lewal v. United States, supra, 1998 WL 425877 at *2.

53

iv.  Bashkim Mustafaj

DiPietro requests all investigative reports and rough
notes of the FBI, WCDAO, NYSP or prosecutors' contacts or meet-
ings -- including the substance of any oral statements given to
law enforcement/prosecutors that were not memorialized in writing
-- with Mustafaj.  On November 21, 2009, DiPietro's private
investigator interviewed Mustafaj, who claimed that Celaj testi-
fied falsely at trial with respect to the attempted robbery in
Eastchester (DiPietro Discovery Memo at 13; DiPietro Habeas Memo
at 8, citing Clutter Memorandum of Interview, attached as Tab 3
at Exhibit A).  Specifically, DiPietro asserts that Celaj falsely
claimed that Celaj met DiPietro at the Raceway Diner in Yonkers
and planned the Eastchester attempted robbery and other robberies
(DiPietro Habeas Memo at 8).  Mustafaj claimed that he was with
Celaj on the date of the alleged meeting at the Raceway Diner,
and that no discussion concerning any criminal activity took
place (DiPietro Habeas Memo at 8).  He also told DiPietro's
investigator that Celaj told lies in order to get out of prison
(DiPietro Habeas Memo at 8, citing Clutter Memorandum of Inter-
view, attached as Tab 3 at Exhibit A).

The evidence offered by DiPietro with respect to
Mustafaj does not warrant discovery.  Mustafaj told DiPietro's

54

investigator that he was never interviewed by the FBI (Clutter Memorandum of Interview, attached as Tab 3 at Ex. A to DiPietro Habeas Memo), and, therefore, there is no reason to believe that responsive documents exist.  Additionally, DiPietro did not produce a sworn affidavit from Mustafaj, but rather a hearsay memorandum from his investigator.  As with Nicaj, DiPietro has failed to offer anything beyond mere hearsay, and, therefore, I find that DiPietro has not shown good cause.

### b.  Perazzo Evidence

DiPietro seeks all still-outstanding reports and rough notes, and the substance of any oral statements given to law enforcement or prosecutors -- including those of the WCDAO -- regarding Perazzo, the victim of the charged acts.  DiPietro and Pizzuti also seek all evidence pertaining to the receipt, view- ing, retention and destruction of video surveillance tapes of Perazzo's home.  The government claims that it already turned over pertinent Brady material, and that DiPietro is not entitled to any further discovery.

Prior to trial, the prosecution provided the defendants the FBI Form 302 report reflecting the government's interviews of Perazzo on May 11, 17 and 20, 2004, and the underlying notes from those interviews (Memo in Opp. to Discovery at 13-14).  Moreover,

on June 9, 2005, the United States Attorney's Office sent a letter to all defense counsel "that John Perazzo is available for you to subpoena as a witness in this case, should you desire his testimony during your defense case" (Ex. A, attached to Gov't Opp. Memo).  Those disclosures and the letter put defense on notice and, thus, fulfilled the prosecution's requirements under Brady.  See United States v. Grossman, supra, 843 F.2d at 85.

Despite the government's production of the reports of its interviews of Perazzo, the defendants did not call him, implying that the defense had concluded that he had no information helpful to the defense.  Petitioners here offer no evidence whatsoever that their trial counsel's judgment was wrong in any respect or that Perazzo had some additional exculpatory information.[11]

---

[11]I afford no weight to the unsworn transcript of a conversation that purportedly took place between Perazzo and Mosiello on July 11, 2001, in which Perazzo claims he was never kidnapped (Ex. B, annexed to Pizzuti Supplemental Habeas Memo). I also conclude that the transcript could not sustain a Brady claim, because defendants should have known of this conversation and factored it into their decision to call Perazzo to testify at trial.  See United States v. Grossman, supra, 843 F.2d at 85.  On July 9, 2001, some of the charged events took place concerning Perazzo.  On July 10, 2001, Pizzuti and members of DiPietro's group met with Mosiello to discuss Perazzo's letter to the FBI (Tr. 1279, 1548, 1620-21).  That day, Mosiello was involved with Pizzuti and others in deleting files at Perazzo's house (Tr. 1302-03, 1319, 1569-71, 1621, 2376-77, 2695, 2820-22).  Given the extent of Mosiello's relationship with the defendants and his
(continued...)

It is of no moment that DiPietro claims that the WCDAO did not turn over a letter that Perazzo wrote to his former attorney (DiPietro Habeas Memo at 8, <u>citing</u> Tab 5 at Ex. A; DiPietro Discovery Memo at 14). DiPietro claims that Perazzo stated in the letter "the person responsible for planning the [Eastchester] robbery was [co-defendant] Angelo Capalbo, not DiPietro" (DiPietro Habeas Memo at 8; DiPietro Discovery Memo at 14). DiPietro offers no evidence to support his claim that the WCDAO possessed the letter, and a close reading of the letter reveals that it does not contain the statement described by DiPietro.

DiPietro's contention that the letter was filed in Westchester County Court and, thus, was known to the WCDAO is not necessarily true (DiPietro Habeas Memo at 8). The government contends that the letter appears to be a privileged communication between a criminal defendant and his attorney and, to its knowledge, "was never in the Government's possession until it received the letter from DiPietro in connection with this petition" (Gov't Opp. Memo at 36).

---

[11](...continued)
other assistance, I conclude that defendants either knew or should have known that Mosiello interviewed Perazzo on the following day, July 11, 2001, and that Perazzo told Mosiello that no kidnapping ever occurred.

Furthermore, the letter (which is unsworn) is not material for Brady purposes.  Crucially, the letter does not mention DiPietro's name, so it is difficult to conclude that the letter exculpates him.  Although the letter states that Capalbo "set-up [sic] a major robbery in Eastchester" (Tab 5 at Ex. A, attached to DiPietro Habeas Memo), other facts in the letter indicate that this was not the charged crime.  The letter refers to an "old lady" who was "gun wipped [sic]" (Tab 5 at Ex. A, attached to DiPietro Habeas Memo), which is not consistent with the bungled Eastchester robbery of which DiPietro was convicted.  For these reasons, good cause has not been shown to order discovery concerning this matter.[12]

---

[12]On January 3, 2011, the undersigned received an unauthenticated audio recording and a transcript from DiPietro's attorney, purporting to be a conversation between DiPietro's son and Perazzo from September 2, 2010.  Among the statements that Perazzo allegedly makes in the transcript are, "I saw some stuff today from Sanginiti that I could not even phantomly believe. . . .  about all the money and everything else.  It was such a farce of untruth. . . .  I think he was fed a lot of stuff to say."  As with the unsworn letters from Wieland and Taddeo addressed supra, I decline to afford any weight to this transcript because it is unauthenticated.  Furthermore, while a review of the transcript reveals a few words here and there that pique one's interest, the transcript as a whole is vague, and it is impossible to discern what specific testimony by Sanginiti that Perazzo believes to be false.

58

c.  <u>Sanginiti Evidence</u>

DiPietro requests all Federal Bureau of Investigation Form 302's, including drafts and notes of each individual interview with Sanginiti.  This discovery request stems from DiPietro's comparison of a redacted Form 302 report he obtained through a Freedom of Information Act request with one that he received from prosecutors pursuant to the Jencks Act, 18 U.S.C. §§ 3500 <u>et</u> <u>seq</u>. (DiPietro Discovery Memo at 11).  DiPietro asserts that "[t]hese 302s vary from each other, in ways that cannot be assessed, given the redacted FOIL document" and believes that not all of the FBI investigative reports concerning Sanginiti were turned over in discovery (DiPietro Discovery Memo at 11).  DiPietro alleges that "the prosecution apparently produced a single composite report that blended all of Sanginiti's prior interviews into one document, thereby suppressing <u>Brady</u>/<u>Giglio</u> evidence through limiting Sanginiti's exposure to cross-examination by prior inconsistent statement" (DiPietro Discovery Memo at 11).

The government claims that it produced all of the 302's concerning Sanginiti and the underlying notes to the defense prior to trial (Memo in Opp. to Discovery at 20, <u>citing</u> Falsone Aff. at ¶ 3(f), attached as Ex. 1).  FBI Supervisory Special

Agent Falsone believes the redacted document "is substantively the same as the document that was produced and marked 3518-H" (Memo in Opp. to Discovery at 20, <u>citing</u> Falsone Aff. at ¶ 3(g), attached as Ex. 1).

An examination of the two versions of the Form 302s submitted by DiPietro reveals at least four discrepancies (<u>see</u> Ex. F to DiPietro Discovery Memo). First, there is a "0" on the upper left hand corner of Page 1 of the redacted 302 which does not appear on the unredacted 302 that is Bates stamped 3518-H. Second, the unredacted 302 was manually initialed on page 1 by Special Agent Falsone. His handwritten initials pass through the typed file number that appears on the line above his initials. The file number on page 1 of the redacted version does not have any initials superimposed on it. Third, there is unredacted language on page 9 of the redacted 302 which reads "Individual heard that;" that phrase does not appear anywhere on Page 9 of the unredacted 302. Finally, the numeral "9" representing Page 9 of the redacted 302 is lower on the page than the numeral "9" of the unredacted 302.

The government has also submitted a second Form 302 -- marked 3518-P -- that was produced to petitioners as part of the pretrial discovery in the criminal case. This document, however, does nothing to explain the discrepancies between the version of

3518-H provided to petitioners in discovery and the version DiPietro obtained pursuant to his FOIA request.

The discrepancies between the version of the 302 designated 3518-H produced in discovery and the version obtained by DiPietro pursuant to the FOIA are troubling, a fact that is aggravated by the lack of any explanation from the government for the discrepancies.  In addition, the government's assertion that Special Agent Falsone believes both versions of the document are "substantively the same" is an admission that they are not identical.  Clearly, the FBI cannot generate one version of a 302 for production in pretrial discovery in a criminal case and a different version for retention in the files.  Because petition-ers have shown specific facts giving rise to questions concerning the authenticity and completeness of the government's pretrial discovery concerning Sanginiti, entitling them to discovery.  In reaching this conclusion, I have not overlooked the fact that in order be entitled to discovery, petitioners must offer "specific allegations [showing that there is] reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief" Bracy v. Gramley, supra, 520 U.S. at 908-09.  I conclude that they have met this standard.  They have offered specific facts demonstrat-ing that the government inexplicably prepared alternate versions

61

of the same document.  The government's response appears to admit that substantially similar but different versions of the document exist and offers no explanation for preparation of alternate versions.  It is far too early to conclude, or even suggest, that there was misconduct, but the unexplained existence of two different versions of the same Form 302 removes such a possibility from the realm of pure speculation.  To demand that petitioners show more here would effectively put them to an impossible task, requiring them to demonstrate how they will use the contents of the documents they seek to discover.  Requiring impossible feats cannot be the meaning of the good cause requirement.

Accordingly, I conclude that petitioners are entitled to all Form 302's and notes concerning interviews with or debriefings of Sanginiti, including an unredacted version of the Form 302 produced to DiPietro in response to his FOIA request. Finally, if the Form 302 produced in pretrial discovery is not identical to the unredacted version of the Form 302 produced to DiPietro in response to his FOIA request, the government is also to provide an explanation of why two different versions of the same document were prepared.

d.  <u>Celaj Evidence</u>

DiPietro requests two remaining classes of <u>Brady</u>
material concerning cooperating witness Celaj:  (1) all informa-
tion provided by the prosecution to Celaj, his attorney, the
Department of Homeland Security or any other federal agency for
the purpose of preventing Celaj's deportation, and (2) any and
all notes of Celaj's proffer sessions with the WCDAO.

DiPietro seeks discovery concerning efforts to prevent
Celaj's deportation because he contends that both the prosecution
and Celaj made false statements at trial regarding Celaj's
immigration status.  DiPietro asserts that Celaj was released and
avoided deportation due to his cooperation with the prosecution.
DiPietro further asserts that the prosecution knew that Celaj
would avoid deportation when it told the jury that deportation
"was a certainty" and that Celaj falsely testified that he was
not going to appeal or contest his deportation order (DiPietro
Habeas Memo at 15; DiPietro Discovery Memo at 11-12).

In 2005, Celaj testified concerning DiPietro's extor-
tion of Perazzo and the Eastchester burglary.  At that time,
Celaj was subject to a final order of deportation (Gov't Opp.
Memo at 49).  He testified on direct examination that he had not
appealed the deportation order and expected to be deported after

63

serving his prison sentences (Gov't Opp. Memo at 47).  Further-more, Celaj testified that no provision existed in his coopera-tion agreement with the government for relief from the deporta-tion order (Gov't Opp. Memo at 47).  On cross-examination, Celaj was asked if he planned to ask the government for help to avoid deportation (Gov't Opp. Memo at 47-48).  He stated that he thought it was impossible to avoid deportation and that he had no plans to ask for their intervention (Gov't Opp. Memo at 47-48).

Subsequent to petitioners' convictions, Celaj did challenge his deportation order and received a deferral because of the prevalence of organized crime in Albania and the possibil-ity that he would be tortured there (Gov't Opp. Memo at 50 n.19; Memo in Opp. to Discovery at 22).  The government claims that the immigration judge from the Department of Justice Executive Office for Immigration Review reached this decision without any input from the prosecutors in petitioner's case.  DiPietro has offered no evidence to the contrary.

Pursuant to its agreement with Celaj, the government provided Celaj's immigration lawyer with copies of the charges against Celaj, his cooperation agreement and the U.S.S.G. § 5K1.1 letter that the government submitted to Judge Kram in advance of Celaj's sentencing (Gov't Opp. Memo at 49-50).  There is no evidence suggesting that a secret deal existed between the

government and Celaj, or that Celaj was committing perjury at the time he testified.  There is no evidence, therefore, that Celaj was lying on the stand at petitioners' trial simply because he subsequently appealed his deportation order successfully.  Celaj might have simply changed his mind -- or his attorney may have explained and pursued a previously unknown ground for appeal after the fact -- and DiPietro offers no evidence suggesting otherwise.  For this reason, DiPietro has not shown good cause, and discovery will not be ordered here concerning efforts to prevent Celaj's deportation.

DiPietro also requests "production of any and all notes or reports of Celaj's Westchester proffer sessions" (DiPietro Discovery Memo at 12).  He seeks discovery of this information without any further elaboration and without any effort to provide the specific evidence that is required to satisfy his "heavy burden."  Renis v. Thomas, supra, 2003 WL 22358799 at *2 (citation omitted).  He has not put forth "specific allegations" that give the Court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  Bracy v. Gramley, supra, 520 U.S. at 908-09, quoting Harris v. Nelson, supra, 394 U.S. at 300 (internal quotation marks omitted).  As such, no good cause has been shown, and discovery is unwarranted here.

65

e.  All other Brady/Giglio evidence

Finally, DiPietro seeks all other Brady/Giglio evidence in possession of the prosecution team, which he argues includes the WCDAO and NYSP (DiPietro Discovery Memo at 14).  In support of his request for state files, DiPietro cites memoranda written by Deputy Attorney General David W. Ogden regarding the policy of the Department of Justice on Brady and Giglio material.  One of Ogden's memos reads, in part,

> It is the obligation of federal prosecutors, in prepar-
> ing for trial, to seek all exculpatory and impeachment
> information from all [the] members of the prosecution
> team.  Members of the prosecution team include federal,
> state, and local law enforcement officers and other
> government officials participating in the investigation
> and prosecution of the criminal case against the defen-
> dant.

(DiPietro Discovery Memo at 4, citing USAM § 9-5.001(B)(2)).

According to another Department of Justice memo, among the factors determining whether a "prosecution team" exists among state and federal prosecutors are:

> (1) whether state or local agents are working on behalf
> of the prosecutor or are under the prosecutor[']s
> control; (2) the extent to which state and federal
> governments are part of a team, are participating in a
> joint investigation, or are sharing resources; and (3)
> whether the prosecutor has ready access to the evi-
> dence.

(Ex. A at 3-4, attached to DiPietro Discovery Memo).

It is unnecessary to conduct an analysis as to whether the prosecution of Perazzo in state court -- and any subsequent investigation of DiPietro that flowed therefrom -- constituted part of the federal "prosecution team."  In order to be granted discovery in this area, DiPietro must, in the first instance, put forth specific evidence justifying the discovery.  Renis v. Thomas, supra, 2003 WL 22358799 at *2 (citation omitted).  As already addressed above, in all of the circumstances where DiPietro seeks material purportedly possessed by state officials, he has not put forth "specific allegations" that give me "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  Bracy v. Gramley, supra, 520 U.S. at 908-09, quoting Harris v. Nelson, supra, 394 U.S. at 300 (internal quotation marks omitted).  Hence, he has not shown good cause, and no other discovery of Brady/Giglio material from state personnel is warranted.

### 4.  Pizzuti's Remaining Claims

#### a.  Wiretap Application

In connection with his ineffective assistance of counsel claim, Pizzuti requests the original wiretap application

67

for his telephone number, 914-490-1007, prepared by the WCDAO.
Pizzuti argues that his trial counsel failed to move to suppress
the recordings made through this application (Pizzuti Supplemen-
tal Habeas Memo at 72).  Pizzuti argues that the conversations
intercepted from the wiretap related to offenses other than those
specified in the wiretap warrant, which was the selling of
untaxed cigarettes (Pizzuti Supplemental Habeas Memo at 72).
Quoting 18 U.S.C. § 2517, he argues that these conversations
should not have been disclosed without the authorization or
approval of "a judge of competent jurisdiction where such judge
finds on subsequent application that the contents were otherwise
intercepted in accordance with the provisions of" the statute
(Pizzuti Supplemental Habeas Memo at 72).  Pizzuti claims that
none of the wiretap applications made reference to extortion,
firearms offenses or obstruction of justice, and he claims that
no subsequent applications were made to a judge of competent
jurisdiction (Pizzuti Supplemental Habeas Memo at 72-75).

        The government argues that it turned over documents
related to the wiretap of this phone number prior to trial and
cites Pizzuti's own supplemental memo in support of his Section
2255 claim (see Memo in Opp. to Discovery at 26).  Indeed,
Pizzuti attached two affidavits in support of the wiretap in his
memo -- one from detective sergeant Walter Roland of the Mount

Vernon Police Department requesting the wiretap, and one from
investigator Stephen Hegarty of the New York State Police Depart-
ment requesting its extension (see Exs. F and G, attached to
Pizzuti Supplemental Habeas Memo).  However, I conclude that
these affidavits are not a proper substitute for the original
application.  Therefore, I order the prosecution to produce the
original wiretap application for 914-490-1007.  Pizzuti has shown
good cause here.  He provides specific evidence in the form of
the affidavits that the government has already turned over that
"the requested discovery would support his habeas corpus peti-
tion."  Ruine v. Walsh, supra, 2005 WL 1668855 at *6, quoting
Hirschfeld v. Comm'r of the Div. of Parole, supra, 215 F.R.D. at
465 (internal quotations omitted).  In order to press his inef-
fective assistance claim, Pizzuti is entitled to the original
wiretap application to the extent it is in the possession,
custody or control of the government.

     b.  Perazzo Grand Jury

     Pizzuti also seeks all grand jury testimony, notes,
memoranda and documentation relating to Perazzo and any inter-
views of Perazzo.  The government does not address this request
squarely in its memo in opposition to discovery, but it generally
asserts that it turned over "the FBI 302 report from the Govern-

ment's interviews of Perazzo on May 11, 17 and 20, 2004, and the underlying notes from those interviews" (Memo in Opp. to Discovery at 13-14).

>The standard for releasing grand-jury materials was
>
>set forth in, e.g., Illinois v. Abbott & Associates, 460 U.S. 557, 103 S.Ct. 1356, 1361 & n. 14, 75 L.Ed.2d 281 (1983); Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 & n. 8, 99 S.Ct. 1667, 1672 & n. 8, 60 L.Ed.2d 156 (1979); United States v. Procter & Gamble Co., 356 U.S. 677, 683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958).  These Supreme Court cases establish that for the release of grand jury materials, which are traditionally protected by a "General Rule of Secrecy," Fed.R.Crim.P. 6(e)(2), the movant must make a particularized showing of compelling need; proof of mere relevance, economy, and efficiency will not suffice.

United States v. Charmer Indus., 711 F.2d 1164, 1174 (2d Cir. 1983).

>Pizzuti asserts that
>
>Perazzo was a government cooperator at the time of Petitioner's trial, despite the fact the prosecution represented him to be a witness equally available to all parties.  The failure of the government to produce the Westchester County District Attorney investigative files deprived the Petitioner of the opportunity to independently review the terms of Perazzo's state plea agreement that obligated him to cooperate with federal authorities.  Petitioner believes the grand jury testimony of Perazzo was used to inculpate the Petitioner, when in fact the government knew Perazzo was not credible and thus elected not to present the victim's testimony at trial.

(Motion for Discovery at 5-6).

To the extent that Pizzuti is requesting the grand jury minutes, he has not made a particularized showing of compelling need.  Rather, Pizzuti could have subpoenaed Perazzo to testify.

To the extent Pizzuti is requesting information that could not be considered grand-jury material, his request is also denied.  In support of his claim, Pizzuti submitted a letter and exhibits to Judge Holwell, including a sworn statement from Perazzo (Pizzuti's Supplemental Exhibit and Letter in Support of his 28 U.S.C. § 2255 Petition, dated November 11, 2010 ("Pizzuti Supplemental Exhibit") (Docket Item 25 in 10 Civ. 199)).  Perazzo never denies that he was kidnapped or the subject of extortionate demands -- which is the crux of the matter with respect to Pizzuti's convictions -- only stating in vague terms that "[t]here are some differences in the actuality of what exactly had happened to me" and the FBI investigative report that he was shown in 2010.  Perazzo states that he should be questioned about these differences and suggests an evidentiary hearing.  But neither Pizzuti nor Perazzo satisfactorily explains why Perazzo was not called to testify on behalf of the defendants if he possessed exculpatory information.  I conclude that Pizzuti has not met his heavy burden here.

c.  Pizzuti Plea Agreement

In connection with his ineffective assistance of counsel claim, Pizzuti also seeks all notes, memoranda or other documentation of any plea agreement proposal offered to him. Pizzuti claims that his counsel did not pursue a plea bargain with either the United States Attorney in the Southern District or the WCDAO (Pizzuti Habeas Memo at 3). In response, the prosecution could not locate any evidence that Pizzuti was ever charged by law enforcement in Westchester or anywhere else in New York State (Gov't Opp. Memo at 76). Thus, if any documents concerning a possible plea agreement exist they would relate only to an agreement with the United States Attorney's Office.

Discovery is not warranted "where the petitioner provides no specific evidence that the requested discovery would support his habeas corpus petition." Hirschfeld v. Comm'r of the Div. of Parole, supra, 215 F.R.D. at 465; see also Valencia v. United States, 03 Civ. 5346 (KMW), 97 Cr. 355 (KMW), 2007 WL 2111074 at *2 (S.D.N.Y. July 13, 2007) (Wood, D.J.) ("Although Petitioner alleges that her lawyer failed to inform her about a plea agreement offer from the Government, she provides neither evidence of such an offer nor any details about when and how it was made. . . . [A] conclusory allegation of this nature, without

any support, does not constitute a prima facie case for relief, and therefore, no good cause exists for the Court to grant Petitioner's discovery motion.").

Pizzuti provides no details about any possible plea agreement or when or how it was made.  Indeed, I conclude that Pizzuti has made nothing more than generalized statements that there might have been a desire by the United States Attorney's Office or WCDAO to work out a plea deal with Pizzuti, and "[g]eneralized statements regarding the possibility of the existence of discoverable material will not be sufficient to establish the requisite 'good cause.'"  Ruine v. Walsh, supra, 2005 WL 1668855 at *6, citing Gonzalez v. Bennett, 00 Civ. 8401 (VM), 2001 WL 1537553 at *4 (S.D.N.Y. Nov. 30, 2001) (Marrero, D.J.).  Therefore, Pizzuti has not shown good cause, and no discovery of this material -- if it even exists -- is warranted.

d.  Pereira's Whereabouts

Pizzuti also seeks all records and memoranda of the United States Probation Department documenting Pereira's where-abouts from April 26, 2005, to July 12, 2005 -- and if there are no records, a statement to that effect.  Pizzuti seeks this information in connection with his claim that his trial counsel was ineffective.  Specifically, Pizzuti claims that his trial

73

counsel, Michael Kennedy, was ineffective because he failed to locate Pereira and to call him as a defense witness at trial (Pizzuti Supplemental Discovery Memo at 2).  The government argues that Pizzuti can obtain the information in the probation reports directly from Pereira.

Courts have rarely ordered the disclosure of probation records to a third party.  See United States v. Watkins, 623 F. Supp. 2d 514, 516 (S.D.N.Y. 2009) (Rakoff, D.J.), citing United States v. Charmer Indus., supra, 711 F.2d at 1173.

> Presentence reports are not considered public records, but instead are generally viewed as confidential court documents, so as to "ensure the availability of as much information as possible to assist in sentencing." United States v. Charmer Indus., Inc., 711 F.2d 1164, 1171 (2d Cir.1983).  Accordingly, disclosure of presentence reports to third-parties is permitted only upon a showing that there is "a compelling need for disclosure to meet the ends of justice." Id. at 1176.  A "central burden" in making the required showing is "the degree to which the information in the presentence report cannot be obtained from other sources." Id. at 1177.  District courts have "a fair measure of discretion in weighing the competing interests in order to determine whether or not the person seeking disclosure has shown that the ends of justice require disclosure." Id.  This standard likewise applies to applications for the disclosure of federal probation records.  See In re Lobel, 03 CR 296, 2005 WL 783366, at *1, 2005 U.S. Dist. LEXIS 5869, at *2-3 (S.D.N.Y. April 6, 2005).

United States v. Watkins, supra, 623 F. Supp. 2d at 516.

Kennedy claims that he made several unsuccessful efforts to procure Pereira as a witness (Affirmation of Michael

Kennedy, Esq., annexed as Ex. B to Gov't Opp. Memo ("Kennedy Aff."), at ¶ 7).  Kennedy states that immediately after a letter was sent by his colleague to a Probation Officer in Springfield, Massachusetts, to procure Pereira, Pereira became unreachable, both to Pizzuti and his attorneys and to the Probation Department (Kennedy Aff. at ¶ 7).

Pereira claims that he constantly communicated by telephone with Pizzuti during Pizzuti's trial because Pereira was an unindicted conspirator (Affidavit of Manuel Pereira, annexed as Ex. 2 to Pizzuti Supplemental Discovery Memo ("Pereira Aff."), at ¶ 3).  Pereira claims that he was asked to testify by Pizzuti and his attorneys and that he would have testified (Pereira Aff. at ¶¶ 4-5).  He further claims that his Probation Officer granted permission for him to travel to New York to testify, and that Kennedy's allegations that Pereira was reluctant, unavailable and unwilling to testify are "a complete misstatement of the facts to say the very least" (Pereira Aff. at ¶ 14).  Pereira claims that he was concerned that he wasn't called as a witness and tele-phoned Pizzuti nightly for an explanation (Pereira Aff. at ¶ 16).

Weighing the competing interests here, I conclude that good cause has not been shown.  While it is possible that release of the probation records may further illuminate this issue of

contradictory affidavits, I find that petitioner has not met his "central burden."  In fact, Pizzuti has obtained information that might have been in the probation report -- Pereira's availability -- from Pereira himself.  Subsequent to Kennedy's affidavit, Pizzuti secured an affidavit from Pereira concerning his alleged unavailability.[13]  As such, the merits of this claim can be decided on the present submissions without need for discovery of the probation report.  Therefore, Pizzuti has not shown "a compelling need for disclosure to meet the ends of justice." United States v. Watkins, supra, 623 F. Supp. 2d at 516, quoting United States v. Charmer Indus., supra, 711 F.2d at 1176.

### e.  Private Investigator Files

Finally, Pizzuti has not put forth any specific evidence that his request for the files of private investigation firm Innovative Strategists, Inc. would support his habeas petition.  Thus, he has not come close to establishing good cause.  Rather, Pizzuti seeks redress from the Court because his old investigator won't give his new investigator its files

---

[13] Additionally, Pizzuti has requested an affidavit from Walter Bush, the Probation Officer overseeing Pereira's probation at the time (see Letter to Walter Bush, attached as Exhibit 4 to Pizzuti Supplemental Discovery Memo).

(Pizzuti Supplemental Discovery Memo at 1).  Without good cause,
however, Pizzuti is not entitled to discovery of these files.

### f.  Evidentiary Hearing

For the reasons already addressed above, I find that
neither petitioner has "set forth specific facts which he is in a
position to establish by competent evidence."  <u>Dalli v. United
States</u>, <u>supra</u>, 491 F.2d at 761, <u>citing</u> <u>Machibroda v. United
States</u>, 368 U.S. 487, 495-496 (1962).  Rather, these assertions
are either conclusory generalizations or inadmissible hearsay.
Therefore, an evidentiary hearing is not warranted with respect
to either DiPietro or Pizzuti.

## IV.  <u>Conclusion</u>

For the foregoing reasons, petitioners are entitled to
all Form 302's and notes concerning interviews with or debrief-
ings of Sanginiti, including an unredacted version of the Form
302 DiPietro received in response to his FOIA request.  Further-
more, if the Form 302 produced in pretrial discovery is not
identical to the unredacted version of the Form 302 produced in
response to DiPietro's FOIA request, the government is also to
provide an explanation of why two different versions of the same
document were prepared.  The government is also directed to

77

possession, custody or control.   The motions are denied without

prejudice to renewal in all other respects.

Dated:   New York, New York
         August 18, 2011

                              SO ORDERED



                              _____
                              HENRY PITMAN
                              `United States Magistrate Judge

Copies mailed to:

Mr. Michael Pizzuti
51089-054
FCI Allenwood Low
Federal Correctional Institution
P.O. Box 1000
White Deer, Pennsylvania  17887

Mr. Joseph Genua
56988-054
FCI Butner Medium II
Federal Correctional Institution
P.O. Box 1500
Butner, North Carolina  27509

Joseph A. Bondy, Esq.
Law Offices of Joseph A. Bondy
Suite 1200
20 Vesey Street
New York, New York  10007

Hadassa R. Waxman, Esq.
United States Attorney Office
Southern District of New York
One Saint Andrew's Plaza
New York, New York  10007

78