```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

MICHAEL PIZZUTI,                    :

                 Petitioner,   :    10 Civ. 199 (LAP)(HBP)
                                    02 Cr. 1237 (LAP)(HBP)
    -against-                  :

UNITED STATES OF AMERICA,      :

                 Respondent.   :

-----------------------------------X

JOSEPH GENUA,                       :

                 Petitioner,   :    10 Civ. 1003 (LAP)(HBP)
                                    02 Cr. 1237 (LAP)(HBP)
    -against-                  :

UNITED STATES OF AMERICA,      :

                 Respondent.   :

-----------------------------------X

ANGELO DIPIETRO,                    :

                 Petitioner,   :    10 Civ. 2585 (LAP)(HBP)
                                    02 Cr. 1237 (LAP)(HBP)
    -against-                  :
                                    OPINION
UNITED STATES OF AMERICA,      :    AND ORDER

                 Respondent.   :

-----------------------------------X
```

PITMAN, United States Magistrate Judge:

I.  Introduction

        By notice of motion dated February 12, 2012 (Docket
Item ("D.I.") 19 in 10 Civ. 2585[1]), petitioner Angelo DiPietro
moves for reconsideration of my Opinion and Order dated August
18, 2011 ("August 2011 Order") to the extent that it denied
DiPietro's requests for certain discovery.  For the reasons set
forth below, DiPietro's motion for reconsideration is denied.

II.  Facts

    A.  Facts Underlying
        DiPietro's Convictions[2]

        DiPietro's convictions arose, in part, out of numerous
violent crimes committed between 2001 and 2003, including crimes
committed in an effort to recover money from John Perazzo, the
operator of a pyramid scheme.[3]

_____

        [1]Unless otherwise indicated, all references to Docket Items
refer to 10 Civ. 2585.

        [2]My summary of the facts underlying DiPietro's convictions
is limited to conduct and offenses relevant to the claims
DiPietro asserts.  It is not a complete summary of all the
evidence offered at trial.

        [3]Perazzo's fraudulent activity is not in dispute; he was
arrested and charged by the Westchester County District
                                                (continued...)

Perazzo's pyramid scheme paid returns to investors as promised through March 2001 (Tr.[4] 1118).  In April 2001, investors began having difficulty getting paid by Perazzo or even contacting him (Tr. 1118-19, 1376-77), and various investors began to suspect that Perazzo was running a Ponzi scheme (Tr. 1379, 1419).

Maurizio Sanginiti was one of the investors to whom Perazzo owed money.  In the spring of 2001, Sanginiti recruited DiPietro to extort money from Perazzo.  Sanginiti chose DiPietro for the task because DiPietro had a reputation as a "tough guy" with special talents for collecting money (Tr. 1121-26, 1912-14, 2562-63).  After a check he had received from Perazzo for $147,000 was returned unpaid for insufficient funds, Sanginiti conspired with DiPietro and Angelo Capalbo on June 28, 2001 to kidnap Perazzo (Tr. 1126, 1460-61, 1484, 1934, 2154, 2574-75).  The kidnapping was intended to ensure that Sanginiti's gang was repaid before Michael Pizzuti's, a competing creditor of Perazzo (Tr. 1126-27).

---

[3](...continued)
Attorney's Office (the "WCDAO") on August 31, 2001 with crimes relating to his Ponzi scheme.  He pled guilty pursuant to a cooperation agreement with the WCDAO on September 11, 2002 (see DiPietro's Notice of Motion Pursuant to 28 U.S.C. § 2255, dated March 22, 2010 (D.I. 1), Ex. B).

[4]"Tr." refers to the transcript of petitioners' trial.

On June 29, 2001, Joseph Genua, Richard Wieland, Frank Taddeo and others kidnapped Perazzo at the Cross County Shopping Center in Yonkers, New York (Tr. 1134-37).  To carry out the kidnapping, Sanginiti, Genua and others waited in a white van in a parking lot near an Applebee's restaurant for the other conspirators to bring Perazzo to them (Tr. 1134-41, 1150, 1934-35, 1939, 1985).  When Perazzo reached the van, Genua "grabbed [Perazzo] by the neck and put him in the front seat" and told Perazzo "to shut the fuck up and do what [Genua told him]" (Tr. 1139-40).  Genua wrapped his arm around Perazzo's neck from the back seat and held Perazzo in the seat (Tr. 1140-41).  Perazzo began "sweating, changing colors [and was] nervous [and] stuttering" (Tr. 1140).

The kidnappers took Perazzo to the basement of DiPietro's house in Mount Vernon, New York (Tr. 1141-44).  Genua, DiPietro and Sanginiti stripped Perazzo to ensure he was not wearing a recording device; Genua and others placed Perazzo on a chair and tied his hands together (Tr. 1157-58, 1943-44, 1990, 2567).  DiPietro held a revolver to Perazzo's face and demanded to know when Perazzo would come up with the money (Tr. 1158-59).  Genua threatened to blow off Perazzo's genitals with an explosive device (Tr. 1161-62, 2527-33, 2567).  Perazzo eventually told his kidnappers he had money in the trunk of his car (Tr. 1163, 1165).

4

Genua and DiPietro's son, Anthony DiPietro ("Anthony"), returned to the Cross County Shopping Center and retrieved $11,000 from Perazzo's car; Perazzo was subsequently released (Tr. 750, 1163, 1168-69).

On June 30, 2001, DiPietro and others again met with Perazzo to pressure him to remain silent about the kidnapping and to repay the balance of the money (Tr. 1175-77, 1494, 2052-53). During this meeting, Anthony searched Perazzo's car for additional money (Tr. 1180, 1183-86, 1494-95, 1616-20). Instead of finding money, Anthony found a letter that Perazzo had written to the FBI and other law enforcement authorities (the "Perazzo Letter") (Tr. 1180, 1183-86, 1494, 1582-83, 1616-20). The Perazzo Letter stated, "By you receiving this letter, I am either dead or kidnapped again and will shortly be dead" (Tr. 1618). The Perazzo Letter described the June 29, 2001 kidnapping by Sanginiti, Capalbo, "another Angelo and a Frank" (Tr. 1618). The letter also stated that Pizzuti would know the full names of Perazzo's kidnappers and gave Pizzuti's business and home addresses and telephone numbers (Tr. 1618). The Perazzo Letter went on to state that an attorney named Al Mosiello was also involved (Tr. 1619). In the letter, Perazzo provided details of the "drastic actions" that had been taken against him, including threats to "[c]ut [him] up and put [him] into body bags" (Tr.

1619).  As a result of this letter, DiPietro and others decided
that some associates, including Genua and Wieland, should remain
in Perazzo's home to monitor his financial dealings (Tr. 1175,
1186-87, 1535-36, 2568-69, 3758, 4309).

On July 9, 2001, Pizzuti learned that DiPietro's
associates were holding Perazzo hostage in Perazzo's home, and
Pizzuti's gang headed to Perazzo's house out of concern that
Sanginiti's gang would get a larger repayment than Pizzuti's (Tr.
1188-89, 1521-24, 1534-36).  When Pizzuti's gang arrived, Wieland
called Sanginiti to inform him (Tr. 1188, 1831, 2569).
Sanginiti, in turn, called DiPietro and Capalbo in order to
arrange a meeting with them (Tr. 1188).  DiPietro called Din
Celaj and Marc Nickolson and told them to accompany him to the
meeting and to bring guns (Tr. 1188, 4316-17).

When Sanginiti's gang arrived at Perazzo's house,
Pizzuti was holding a rifle to Perazzo's face (Tr. 1196, 1199-
2000, 1256-60, 1539, 2418-24, 2429-30, 3749-50).  Pizzuti in-
formed DiPietro's gang that "anyone who wanted money from Perazzo
[would have] to go through [him]" (Motion for Permission to File
an Amended Supplemental Memorandum of Law, dated July 23, 2010
(D.I. 8 in 10 Civ. 199) ("Pizzuti Suppl. 2255 Mem.") at 14,
citing Tr. 1196, 1217-18, 3750, 4327).  Pizzuti then dragged
Perazzo out of the house at gunpoint and threw him into the back

of a car (Tr. 1197, 1218-20, 1266, 2435-36, 4330-31).  Pizzuti
eventually took Perazzo to Nyack, New York, where Perazzo spent
the night in a hotel with Pizzuti's associate, Carl Macchiarulo,
before he made a bank transfer of $30,000 to Macchiarulo the
following day (Tr. 1534-35, 1557-58, 1626, 1635-36).

Sanginiti's gang left Perazzo's house when Pizzuti left
with Perazzo (Tr. 1266, 1530-31).  Harold Bringman was the last
member of Pizzuti's gang to leave, and Sanginiti and Capalbo
ordered Celaj to abduct Bringman to find out where Pizzuti had
taken Perazzo (Tr. 1266-69, 1530-31).  Bringman was able to evade
the abduction, and, as Bringman drove away, DiPietro instructed
Celaj to "shoot his fucking ass, shoot his fucking ass" (Tr.
4334).

A car chase ensued on the southbound Hutchinson River
Parkway, with Celaj and Nickolson pursuing Bringman at speeds
exceeding 100 miles per hour (Tr. 1224-26, 1268, 1528-29, 3738-
39, 4334-36).  Celaj fired several shots and hit Bringman's car,
but Bringman escaped while Celaj crashed into a guardrail (Tr.
1225-26, 1233-34, 1270-71, 1537, 3738-42, 4336-37).  That eve-
ning, the rival gangs decided to join forces to coordinate their
efforts to recover money from Perazzo (Tr. 1233-34, 1272-73,
1545, 1577).  These joint efforts lasted until Perazzo's arrest
(Tr. 1273-75, 1278-79).

In addition to extorting Perazzo, DiPietro was involved in a series of robberies of residences in Westchester County, New York, that he believed contained large amounts of cash (Tr. 1648-50).  In the spring of 2001, DiPietro began planning a robbery in Eastchester, New York, with Capalbo, Sanginiti, Nickolson and Celaj and others (Tr. 1658-59, 3770-71, 4364).  DiPietro's own relatives owned the residence, and he believed there was $2.3 million in the house resulting from the family's real estate business (Tr. 3770-72, 4365-66).  DiPietro told at least one conspirator that a father, mother, son and grandmother lived in the house, and to "try your hardest not to hurt no one [sic] but if you have to, do what you got to do" (Tr. 4365-66).

On July 18, 2001, Celaj, Nickolson and Ded Nicaj entered the Eastchester residence, believing it to be empty (Tr. 4367-72).  The men heard voices in the home, however, and confronted the mother and grandmother with a gun (Tr. 4371-72). Nicaj attempted to tie the mother up while Celaj pointed the gun at her (Tr. 4372).  The mother agreed to give the robbers the money, and as the mother was leading Celaj to the money, her son entered the house (Tr. 4373-75).  Celaj pointed the gun at the son, and the situation soon grew "out of control," as "everybody was screaming in the house" (Tr. 3795-96).  One of the conspira-

tors yelled that he had spotted police, and the men fled without taking any money (Tr. 4375-76).

While Nickolson and Nicaj were arrested immediately after the bungled robbery, Celaj called a lookout to pick him up, and he escaped (Tr. 3803-04, 4376-77).  Celaj subsequently met with DiPietro and discussed the failed robbery (Tr. 4378-79).  DiPietro told Celaj, "You have to lay very low . . . it's crazy up there in Eastchester, too much cops [sic]" (Tr. 4379).

In addition to certain items of physical evidence, the government's evidence at trial included recorded conversations from court-authorized wiretaps of telephones used by DiPietro and others in which the plans to extort Perazzo were discussed, the testimony of Sanginiti, Celaj and Nickolson who testified pursuant to cooperation agreements, consensually recorded conversations, the testimony of state and federal law-enforcement authorities who surveilled the defendants and debriefed some of the defendants and the testimony of a forensic computer investigator.

B.  Procedural History

After a trial lasting slightly more than two months, DiPietro was convicted of all offenses with which he was charged. Specifically, Dipietro was convicted of three counts of extortion-related crimes in violation of 18 U.S.C. § 1951

(Counts 1, 3 and 7 of Indictment S5 02 Cr. 1237 (SWK) ("the 1237 Indictment")), two counts of possessing, using or aiding and abetting the illegal possession or use of a firearm in violation 18 U.S.C. § 924(c) (Counts 4 and 8 of the 1237 Indictment), two counts of conspiring to commit or attempting to commit a robbery that would affect interstate commerce, in violation of 18 U.S.C. § 1951 (Counts 11 and 12 of the 1237 Indictment) and three counts relating to the use of extortionate means to collect an extension of credit, in violation of 18 U.S.C. § 894 (Counts 14, 15 and 16 of the 1237 Indictment).[5]   DiPietro was sentenced to a term of imprisonment of 27 years to be followed by a mandatory consecutive sentence of 32 years.[6]

On September 16, 2014, I issued a 131-page Report and Recommendation recommending that all claims of all three petitioners be denied and denying all then-pending motions for discovery.  Subsequent to the issuance of my Report and Recommendation, counsel for DiPietro pointed out that there was an unresolved motion for reconsideration of my August 18, 2011

---

[5]DiPietro's claims in this action arise out of his conviction on Counts 1, 3, 4, 7, 8, 11 and 12 of the 1237 Indictment.

[6]In a separate case, DiPietro was sentenced to an additional term of 300 months to run consecutively to the sentence imposed on the 1237 Indictment.  See United States v. DiPietro, 04 Cr. 1110 (DLC) (S.D.N.Y.) D.I. 439 (Judgment against Angelo DiPietro).

Opinion and Order and that I had previously issued an Order

granting DiPietro 30 days in which to file a reply in further

support of his 2255 motion after I resolved his discovery motion

(D.I. 69 in 10 Civ. 199).  Accordingly, in light of the pending

motion for reconsideration, I withdrew my September 16, 2014

Report and Recommendation (D.I. 75 in 10 Civ. 199).  By this

Order, I resolve DiPietro's motion for reconsideration.

> 1.  The August 18, 2011 Order
>     and DiPietro's Motion
>     for Reconsideration

     In my August 2011 Order, I denied certain discovery

requests because they related to claims that were procedurally

barred and rejected other discovery requests on the merits.

Specifically, I rejected DiPietro's requests for the following

materials on the ground that they related to claims that were

procedurally barred:

> 1.  All investigative reports and rough notes of the FBI or
>     prosecutors' contacts or meetings -- including the
>     substance of any oral statements given to law enforce-
>     ment/prosecutors that were not memorialized in writing
>     -- with Ralph Pizzuti, Carl Macchiarulo and Manny
>     Pereira.
>
> 2.  All evidence pertaining to the receipt, viewing, reten-
>     tion and destruction of video surveillance tapes of
>     Perazzo's home.

3.  <u>Brady</u>[7] material with respect to Sanginiti's cooperation with the WCDAO in the unrelated state prosecution of Roberto DeRosario.

4.  All telephone records pertaining to telephone number 914-420-9773, subscribed in the name of Sanginiti's wife, during the period from June through July 2001.

5.  Recordings of Din Celaj speaking on the telephone from the Metropolitan Correction Center ("MCC") and Metropolitan Detention Center ("MDC") during the time he was cooperating.

6.  All documents and evidence reflecting contact between Celaj and Perazzo's girlfriend, Kaffee Ann Forde, during the period of Celaj's cooperation, including records of commissary payments from Forde for the benefit of Celaj.

I also rejected the following discovery requests on the merits, finding that DiPietro had not shown good cause for the discovery he sought:

1.  All investigative reports and rough notes of the FBI or prosecutors' contacts or meetings -- including the substance of any oral statements given to law enforcement/prosecutors that were not memorialized in writing -- with Richard Wieland, Frank Taddeo, Ded Nicaj and Bashkim Mustafaj.

2.  All still-outstanding reports and rough notes and the substance of any oral statements given to law enforcement or prosecutors -- including those of the WCDAO -- regarding Perazzo.

3.  All information provided by the prosecution to Celaj, his attorney, the Department of Homeland Security or any other federal agency for the purpose of preventing Celaj's deportation and any and all notes of Celaj's proffer sessions with the WCDAO.

---

[7]<u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

4.   All other <u>Brady</u>/<u>Giglio</u>[8] evidence in the possession of
the prosecution team, which DiPietro argued included
the WCDAO and the New York State Police.

I did grant DiPietro's request for discovery with
respect to one class of material.  DiPietro had served a Freedom
of Information Act ("FOIA") request for FBI Form 302s concerning
Sanginiti.  In response to that request, he received a different
version of the Form 302 that was produced to him in discovery in
connection with the underlying trial.  Because DiPietro had shown
that the FBI had prepared different versions of what was, osten-
sibly, the same Form 302 report, I ordered the government to
produce all Form 302s and notes concerning interviews with or
debriefings of Sanginiti, including an unredacted version of the
Form 302 produced to DiPietro in response to his FOIA request.
My August 2011 Order further provided that if the Form 302
produced in pretrial discovery was not identical to the unre-
dacted version of the Form 302 produced to DiPietro in response
to his FOIA request, the government was also to provide an
explanation of why two different versions of the same document
were prepared.

Based on material produced in response to my August
2011 Order and on other newly submitted factual material,

---

[8]<u>Giglio v. United States</u>, 405 U.S. 150 (1972).

13

DiPietro seeks reconsideration of the following aspect of my August 2011 Order:

1. All investigative reports and rough interview notes concerning Frank Taddeo, Ralph Pizzuti, Carl Macchiarulo and Manny Pereira.

2. Documents concerning Sanginiti's cooperation in the Robert DeRosario case.

3. Recordings of Din Celaj speaking on the telephone from the MCC and MDC during the time he was cooperating.

4. All investigative reports and rough interview notes concerning Richard Wieland.

5. All investigative reports and rough interview notes concerning Ded Nicaj.

6. WCDAO notes of proffer sessions or other interview notes concerning Din Celaj and Mark Nickolson.

7. All law enforcement reports, notes and agreement pertaining to Mustafaj or a specific averment that no such evidence exists.

8. All still-outstanding reports and rough notes and the substance of any oral statements given to law enforcement or prosecutors -- including those of the WCDAO -- regarding Perazzo.


III.  Analysis


A.  Applicable
    Legal Standards


In order to obtain any relief on the present motion, DiPietro must meet two demanding standards.  First, he must show that reconsideration is warranted.  Second, assuming that recon-

14

sideration is appropriate, he must show that upon reconsidera-
tion, he has met the demanding standard necessary to warrant
discovery with respect to his 2255 motion.  Because DiPietro must
meet both standards to demonstrate an entitlement to relief, a
failure to meet either warrants denial of his discovery requests.

       1.   Standards Applicable to a
            Motion for Reconsideration

     Because there are no special rules applicable to
reconsideration motions in habeas corpus proceedings, courts
routinely apply the standards generally applicable in civil
cases.  Toolasprashad v. Tryon, No. 12 CV 734, 2013 WL 1560176 at
*2 (W.D.N.Y. Apr. 11, 2013).

     Reconsideration "is an extraordinary remedy to be
employed sparingly in the interests of finality and conservation
of scarce judicial resources."  Ramos v. United States, 580 F.
Supp. 2d 296, 299 (S.D.N.Y. 2008) (Marrero, D.J.) (internal
quotation marks omitted); accord Gonzalez v. United States, 10
Cr. 238 (JFK), 12 Civ. 8261 (JFK), 2014 WL 1725738 at *1
(S.D.N.Y. Apr. 30, 2014) (Keenan, D.J.); see also Nowacki v.
Estate of Closson, No. 99-CV-975, 2001 WL 175239 at *1 (N.D.N.Y.
Jan. 24, 2001).  "The standard for granting [a motion for recon-
sideration] is strict, and reconsideration will generally be

15

denied unless the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Schrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); accord Rosario v. United States, Nos. 3:00-CR-186, 3:04-CV-467, 2006 WL 1789130 at *1 (N.D.N.Y. June 27, 2006).  Reconsideration is not appropriate merely to relitigate matters that were already decided by the court; to warrant reconsideration the petitioner must show that the court overlooked either factual matters or controlling decisions that were before it when it decided the underlying motion.  John v. United States, 09 Civ. 3116 (GBD), 2011 WL 347188 at *1 (S.D.N.Y. Feb. 3, 2011) (Daniels, D.J.).  Reconsideration may also be appropriate "to correct clear error, prevent manifest injustice, or to account for new evidence or a change in controlling law that might reasonably be expected to alter the court's decision." Gonzalez v. United States, supra, 2014 WL 1725738 at *1, citing Beras v. United States, 05 Civ. 2678 (SAS), 2013 WL 2420748 at *1 (S.D.N.Y. June 4, 2013) (Scheindlin, D.J.); accord Thomas v. United States, 02 Civ. 6254 (WHP), 2005 WL 2104998 at *2 (S.D.N.Y. Sep. 1, 2005) (Pauley, D.J.).

   In a motion for reconsideration, a party may not advance new facts, issues, or arguments not previously presented to the court.  Caribbean Trading & Fidelity

16

Corp. v. Nigerian National Petroleum Corp., 948 F.2d
111, 115 (2d Cir. 1991); Walsh v. McGee, 918 F. Supp.
107, 110 (S.D.N.Y. 1996); Walpex Trading Co. v.
Yacimientos Petroliferos Fiscales Bolivanos, 1989 WL
67239 (S.D.N.Y. 1989).  A motion for reconsideration is
not a vehicle for a party dissatisfied with a court's
ruling to secure a rehearing on the merits with respect
to issues already decided. See USA Certified Merchants,
LLC v. Koebel, 273 F. Supp. 2d 501, 503 (S.D.N.Y.
2003); see also Range Rd. Music v. Music Sales Corp.,
90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) ("The . . .
limitation on motions for reconsideration is to ensure
finality and to prevent the practice of a losing party
examining a decision and then plugging the gaps of the
lost motion with additional matters.").

Perez v. United States, 378 F. Supp. 2d 150, 154-55 (E.D.N.Y.

2005); accord Cohn v. Metro. Life Ins., Co., 07 Civ. 0928 (HB),

2007 WL 2710393 at *1 (S.D.N.Y. Sept. 7, 2007) (Baer, D.J.); see

In re City of New York, as Owner & Operator of M/V Andrew J.

Barberi, No. CV-03-6049 (ERK)(VVP), 2008 WL 1734236 at *1

(E.D.N.Y. Apr. 10, 2008), citing Zoll v. Jordache Enters. Inc.,

01 Civ. 1339 (CSH), 2003 WL 1964054 at *2 (S.D.N.Y. Apr. 24,

2003) (Haight, D.J.).


          2.   Standards for Permitting
               Discovery in 2255 Proceedings


     "A habeas petitioner, unlike the usual civil litigant

in federal court, is not entitled to discovery as a matter of

ordinary course."  Bracy v. Gramley, 520 U.S. 899, 904 (1997);

accord Charles v. Artuz, 21 F. Supp. 2d 168, 169 (E.D.N.Y. 1998);

see Harris v. Nelson, 394 U.S. 286, 295 (1969);.  The Second
Circuit has noted that "Rule 6(a) of the Rules Governing Section
2255 Proceedings . . . provides that a § 2255 petitioner is
entitled to undertake discovery only when 'the judge in the
exercise of his discretion and for good cause shown grants leave
to do so, but not otherwise.'"  Lewal v. United States, 152 F.3d
919, 1998 WL 425877 at *2 (2d Cir. 1998) (unpublished summary
order).

> A petitioner "bears a heavy burden in establishing
> a right to discovery." Renis v. Thomas, No. 02 Civ.
> 9256 (DAB)(RLE), 2003 WL 22358799, at *2 (S.D.N.Y. Oct.
> 16, 2003) (citing Bracy, 520 U.S. at 904).  In order to
> show "good cause," a petitioner must present "'specific
> allegations'" that give the Court "'reason to believe
> that the petitioner may, if the facts are fully devel-
> oped, be able to demonstrate that he is . . . entitled
> to relief.'"  Bracy, 520 U.S. at 908-09 (quoting Harris
> v. Nelson, 394 U.S. 286, 300 (1969)).  A court may deny
> a petitioner's request for discovery "where the peti-
> tioner provides no specific evidence that the requested
> discovery would support his habeas corpus petition."
> Hirschfeld v. Comm'r of the Div. of Parole, 215 F.R.D.
> 464, 465 (S.D.N.Y. 2003); see also Charles v. Artuz, 21
> F. Supp. 2d 168, 170 (E.D.N.Y. 1998).  Generalized
> statements regarding the possibility of the existence
> of discoverable material will not be sufficient to
> establish the requisite "good cause."  See Gonzalez v.
> Bennett, No. 00 Civ. 8401(VM), 2001 WL 1537553, at *4
> (S.D.N.Y. Nov. 30, 2001); Green v. Artuz, 990 F. Supp.
> 267, 271 (S.D.N.Y. 1998); Munoz v. Keane, 777 F. Supp.
> 282, 287 (S.D.N.Y. 1991), aff'd sub nom., Linares v.
> Senkowski, 964 F.2d 1295 (2d Cir. 1992).

Ruine v. Walsh, 00 Civ. 3798 (RWS), 2005 WL 1668855 at *6
(S.D.N.Y. July 14, 2005) (Sweet, D.J.) (alteration in original);

accord Rios v. United States, No. 13-CV-5577 (CBA), 2016 WL 3702966 at *9 (E.D.N.Y. July 7, 2016); Vazquez v. Maccone, No. 12-CV-4564 (JMA), 2016 WL 2636256 at *10 (E.D.N.Y. May 6, 2016); Cooper v. United States, 08 Cr. 356 (KMK), 13 Civ. 3769 (KMK), 2015 WL 9450625 at *5 (S.D.N.Y. Dec. 22, 2015) (Karas, D.J.).

Furthermore, "Rule 6 does not license a petitioner to engage in a 'fishing expedition' by seeking documents 'merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error.'" Ruine v. Walsh, supra, 2005 WL 1668855 at *6, quoting Charles v. Artuz, supra, 21 F. Supp. 2d at 169; accord Batista v. United States, No. 14-CV-805 (DLI)(LB), 2016 WL 4575784 at *1 (E.D.N.Y. Aug. 31, 2016).

B.  Application of the
    Foregoing Principles
    to DiPietro's Arguments

    1.  Investigative Reports
        and Rough Interview Notes
        Concerning Frank Taddeo,
        Ralph Pizzuti, Carl Macchiarulo
        and Manny Pereira

DiPietro seeks these materials in connection with an argument that the Government violated its Brady obligations.

a.  <u>Frank Taddeo</u>

To the extent DiPietro seeks reconsideration of the August 2011 Order with respect to Taddeo, his argument appears to be based on a misrepresentation of fact.  Specifically, DiPietro argues that the government's <u>Brady</u> disclosure concerning Taddeo was misleading and, therefore, insufficient and that because of the allegedly misleading disclosure, he did not raise any <u>Brady</u> issue with respect to Taddeo on appeal.  Specifically, DiPietro states in his motion for reconsideration:

> It was not until Frank Taddeo waived his attorney-client privilege and authorized disclosure of his attorney's notes that DiPietro had reason to believe the Government had falsely represented to the Court and counsel that Taddeo corroborated the testimony of Maurizio Sanginiti[9] regarding the Perazzo "kidnapping" of June 29-30, 2001.  Up until then, DiPietro had every right to rely upon the representations of the Government as honest.  Here, the Government's false statements unfairly precipitated DiPietro's "default."

(DiPietro's Memorandum of Law in Support of his Motion for Reconsideration, dated Feb. 2, 2012 (D.I. 20) ("DiPietro Recons. Mem.") at 11-12).  DiPietro does not identify any facts or controlling precedent that I overlooked in my August 2011 Order.

----

[9]As noted above, Sanginiti testified for the prosecution at DiPietro's trial pursuant to a cooperation agreement.  Taddeo was not called as a witness by either side.

The premise of DiPietro's argument -- that the government falsely claimed Taddeo corroborated Sanginiti's testimony -- is itself demonstrably untrue.  The government's <u>Brady</u> disclosure concerning Taddeo provided:

> Pursuant to the Government's obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), we are writing to inform you that you may wish to speak with the following two individuals in connection with this matter:  Ralph Pizzuti and Frank Taddeo.  Ralph Pizzuti is the brother of defendant Michael Pizzuti.  Frank Taddeo is represented by attorney Tony Siriano, Esq., who can be reached at (718) 823-2600.  When questioned by the Government, Frank Taddeo indicated, in substance and in part, that he was present during the specific events charged in Counts Three and Four of the above-referenced superseding indictment and that he did not see anyone threaten the victim.  Similarly, when questioned by the Government, Ralph Pizzuti indicated that he was present during the specific events charged in Counts Five through Nine of the above-referenced superseding indictment and that he did not see anyone threaten the victim.

> From the outset, we want to be clear that, although the information provided by these witnesses arguably constitutes <u>Brady</u> material, under the circumstances of this case, the Government does not believe that these witnesses were truthful during the interviews.

(DiPietro Recons. Mem., Ex. I).[10]   Thus, the government's <u>Brady</u> disclosure concerning Taddeo expressly describes his information as exculpatory.

It is also noteworthy that in connection with his present motion, DiPietro has submitted an affidavit from Taddeo in which Taddeo states, in substance, that he was with DiPietro on the night of Perazzo's kidnapping, that the individuals involved, including Perazzo, had a friendly get-together that evening and that no one was threatened or held against their will (DiPietro Recons. Mem. Ex. J).   If this affidavit is true, DiPietro was with Taddeo on the night of Perazzo's kidnapping and, therefore, DiPietro must have known that Taddeo could provide exculpatory testimony.   If DiPietro had such knowledge -- which he must have had if Taddeo's affidavit is true -- there could be no <u>Brady</u> violation.   "Evidence is not 'suppressed' for

---

[10]DiPietro's Memorandum of Law in support of his motion for reconsideration seems to suggest that the government made some other representation to the trial judge to the effect that Taddeo's information actually inculpated DiPietro (<u>see</u> DiPietro Recons. Mem. at 12-13).   However, neither DiPietro's original motion for discovery nor his motion for reconsideration identifies any other representation by the government that suggested Taddeo inculpated DiPietro.   There is, therefore, no evidence that such representations were made.

DiPietro's contention that the government's <u>Brady</u> disclosure with respect to Taddeo implied that Taddeo had told the government that firearms were present on the night Perazzo was kidnapped (DiPietro Recons. Mem. at 12) is baseless.

Brady purposes if the defendant 'either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'"  United States v. Barcelo, 628 F. App'x 36, 39 (2d Cir. 2015) (summary order), quoting DiSimone v. Phillips, 461 F.3d 181, 197 (2d Cir. 2006); Dodakian v. United States, 14 Civ. 1188 (AJN), 2016 WL 3866581 at *9 (S.D.N.Y. July 12, 2016) (Nathan, D.J.), certificate of appealability denied, Docket No. 16-3057 (2d Cir. Feb. 10, 2017); Colotti v. United States, 11 Civ. 1402 (DLC), 2011 WL 6778475 at *11 (S.D.N.Y. Dec. 21, 2011) (Cote, D.J.); Layton v. Phillips, No. 04 Civ. 4032 (DRH), 2008 WL 413785 at *5 (E.D.N.Y. Feb. 13, 2008), aff'd, 340 F. App'x 687 (2d Cir. 2009) (summary order).  Thus, even if there were some basis to conclude that the government's Brady disclosure concerning Taddeo was lacking or even misleading (and there is no such evidence), there could be no Brady violation because the nature of the allegedly exculpatory information must have been independently known by DiPietro.

DiPietro cites several cases from other Circuits in which the prosecution either mischaracterized the nature of a witness's testimony or affirmatively stated that the testimony would not be helpful to the defense (see DiPietro Recons. Mem. at 12-14).  These cases are factually distinguishable.  The Brady disclosure quoted above unmistakably describes Taddeo's informa-

23

tion as exculpatory.  The fact that the disclosure included the prosecutors' opinion that Taddeo's exculpatory information was not credible certainly did not bind defense counsel nor did it taint the government's <u>Brady</u> disclosure.  The continuation of a criminal prosecution after a <u>Brady</u> disclosure is necessarily an expression of the prosecutor's opinion that the exculpatory information is either not credible or insufficient to rebut the evidence of guilt.[11]  If a prosecutor's rejection of the informa- tion in a <u>Brady</u> disclosure were sufficient to render the disclo- sure insufficient, then all prosecutions in which a <u>Brady</u> disclo- sure was made could be derailed by a defendant's claim that the disclosure was misleading.

Although DiPietro has shown no basis to warrant recon- sideration of my ruling with respect to Taddeo, the foregoing demonstrates that, even if reconsideration were appropriate, his request for discovery fails on the merits because the discovery sought could not provide a basis for establishing a <u>Brady</u> viola- tion and could not, therefore, provide a basis for relief.

---

[11]A prosecutor is ethically bound to discontinue a prosecution if exculpatory evidence establishes a defendant's innocence.  ABA Model Rules of Professional Conduct, Rule 3.8 (a)9, (g) and (h) (1984); <u>see</u> <u>Town of Newton v. Rumery</u>, 480 U.S. 386, 413 (1987).

b.  Ralph Pizzuti, Carl
    Macchiarulo and Manny Pereira

DiPietro makes no specific arguments in support of his motion for reconsideration of the August 2011 Order with respect to Ralph Pizzuti, Carl Macchiarulo and Manny Pereira.  He appears to be relying on the same theory he asserted with respect to Taddeo.[12]  Accordingly, DiPietro's motion fails with respect to

─────────────

[12]The government's Brady disclosure with respect to Macchiarulo and Pereira was substantially similar to its Brady disclosure concerning Taddeo and Ralph Pizzuti.  It provided:

Pursuant to the Government's obligation under Brady v. Maryland, 373 U.S. 83 (1963), we are writing to inform you that you may wish to speak with the following two individuals in connection with this matter:  Carl Macchiarulo and Manuel Pereira.  When questioned by the Government, Macchiarulo and Periera [sic] each indicated, in substance and in part, that he was present during the specific events charged in Counts Five through Nine of the above-referenced superseding indictment and that he did not see anyone carry a firearm or threaten the victim.  We believe that these individuals are close associates of defendant Michael Pizzuti and that counsel to Pizzuti knows how to contact them.  Please contact us if you need additional information to contact them.

From the outset, we want to be clear that, although the information provided by these witnesses arguably constitutes Brady material, under the circumstances of this case, the Government does not believe that these witnesses were truthful during the interviews.  Again, please contact us if you have any questions regarding this matter.

(DiPietro Recons. Mem., Ex. I).

these three individuals for the same reason that it fails with respect to Taddeo, namely that the government's <u>Brady</u> disclosure was appropriate and sufficient.

                    2.   Documents Concerning
                         Sanginiti's Cooperation
                         <u>in the Robert DeRosario Case</u>

        DiPietro's request for discovery concerning Sanginiti's cooperation in the DeRosario case arises out of the following facts.

        Independent of his cooperation in DiPietro's case, Sanginiti assisted the WCDAO in an investigation of the sexual assault and murder of a 12-year-old child.  Prior to Sanginiti's entering into a cooperation agreement with the United States Attorney's Office with respect to the charges against DiPietro, Westchester County authorities contacted the United States Attorney's Office because Sanginiti was a high school classmate of Robert DeRosario, the defendant in the assault/murder case (Tr. 1797-98; Memorandum of Law of the United States of America in Opposition to Motions of Angelo DiPietro and Michael Pizzuti for Discovery in a § 2255 Proceeding ("Mem. in Opp. to Discovery"), dated November 3, 2010 (D.I. 21 in 10 Civ. 199), at 18). Sanginiti did not have knowledge of any facts concerning the assault and murder because those events had taken place long

after Sanginiti's relationship with DeRosario had ended (Mem. in
Opp. to Discovery at 18).  However, the victim's body was found
in a location that Sanginiti and DeRosario had frequented many
years earlier (Mem. in Opp. to Discovery at 19).  Thus, Sanginiti
could testify that DeRosario was familiar with the location in
which the murder victim was found (Mem. in Opp. to Discovery at
18-19, citing Tr. 1797-99).

Sanginiti's federal cooperation agreement had not yet
been finalized when the state authorities sought his testimony
before a grand jury concerning DeRosario.  The United States
Attorney's Office took the position and advised Sanginiti's
counsel in writing that Sanginiti would receive no benefit in the
federal case for his cooperation against DeRosario (Mem. in Opp.
to Discovery at 19, citing Tr. 1797-99).  The government provided
this letter to DiPietro and his co-defendants as part of
Sanginiti's Jencks Act materials (Memorandum of Law of the United
States of America in Opposition to Motions of Angelo DiPietro,
Michael Pizzuti and Joseph Genua under 28 U.S.C. § 2255 and in
Opposition to DiPietro's Motion for Discovery, dated July 30,
2010 (D.I. 9 in 10 Civ. 199) ("Gov't Opp. Mem.") at 56, citing
3518-G).

Sanginiti testified against DeRosario in the grand jury
but not at DeRosario's trial, and the late Honorable Shirley Wohl

27

Kram, United States District Judge, who presided over DiPietro's trial, ruled at trial that Sanginiti could not be impeached or otherwise cross-examined concerning his cooperation in the DeRosario case (Tr. 1797-99).  However, notwithstanding its earlier representations, the government did refer to Sanginiti's cooperation in the DeRosario case at Sanginiti's sentencing as another mitigating factor.

In my August 2011 Order I found that DiPietro could have appealed Judge Kram's ruling concerning Sanginiti to the Second Circuit, but did not.  I concluded, therefore, that DiPietro was procedurally barred from raising any issue in this proceeding concerning Sanginiti's cooperation in the DeRosario and that discovery related to the issue was, therefore, irrelevant.

In support of his motion for reconsideration, DiPietro merely repeats the arguments he made in support of his original motion for discovery.  He does not identify any facts or controlling precedents that I overlooked, nor does he explain how reconsideration is necessary to prevent manifest injustice or to correct clear error.  Accordingly, there is no basis to reconsider DiPietro's request for discovery with respect to Sanginiti's cooperation in the DeRosario case.

28

3.   Recordings of Din Celaj
     Telephone Calls from the
     MCC and MDC while He Was Cooperating

In my August 2011 Order I concluded that any claim
concerning Judge Kram's refusal to grant DiPietro access to
recordings of Celaj's telephone calls while he was incarcerated
in the MCC and MDC was also procedurally barred.  DiPietro had
subpoenaed these recordings during his trial.  Judge Kram quashed
the subpoena, and any claim concerning the request for access to
the recordings should, therefore, have been raised on DiPietro's
direct appeal.

In an effort to muster new facts that might warrant
reconsideration, DiPietro cites information concerning Bashkim
Mustafaj that he claims came to light only as a result of the
discovery I ordered in my August 2011 Order.  However, none of
the "new" evidence DiPietro cites relates to Celaj.  Rather, it
relates only to Mustafaj.  Nevertheless, in an effort to justify
reconsideration, DiPietro simply takes a logical leap and baldly
asserts that Celaj must have been involved with Mustafaj's newly
disclosed criminal conduct.  Given the absence of any evidence
linking Celaj to Mustafaj's newly disclosed criminal conduct,
Mustafaj's conduct is irrelevant.

29

As a fall back, DiPietro also cites a criminal prosecution commenced against Celaj in 2007.  However, all the charges in that case arose out of conduct that commenced in 2007 -- two years after the conclusion of DiPietro's trial.  See United States v. Din Celaj, et al., 07 Cr. 837 (RPP) (S.D.N.Y.) D.I. 102 (superseding indictment).  Thus, those charges have no bearing on DiPietro's failure to challenge the quashing of his subpoena on his direct appeal or the merits of DiPietro's subpoena for the recordings of Celaj's telephone calls.  DiPietro's remaining arguments are frivolous.

Because DiPietro has not shown any basis to reconsider my ruling that any claim concerning the quashing of his subpoena for the recordings of Celaj's telephone calls is procedurally barred, this aspect of his motion is also denied.

        4.   Investigative Reports
           and Interview Notes
           Concerning Richard Wieland

DiPietro also seeks this discovery on the theory that the government violated its Brady obligations with respect to Wieland.  As with Taddeo, DiPietro offers an affidavit from Wieland in which Wieland states that he was present with DiPietro and others on the night of Perazzo's kidnapping, that the evening was a friendly get-together in which the participants shared beer

30

and pizza, that no guns or restraints were involved and that Wieland had disclosed these facts to the FBI on some unspecified date.

Even if DiPietro were able to offer facts or arguments that justified reconsideration, he is not entitled to the discovery he seeks.  As was the case with Taddeo, if Wieland's affidavit is true, DiPietro would necessarily have known of the exculpatory information he is alleged to possess, and if DiPietro knew the nature and extent of Wieland's exculpatory information, there can be no Brady violation, regardless of the nature of the government's disclosure.  United States v. Barcelo, supra, 628 F. App'x at 39; DiSimone v. Phillips, supra, 461 F.3d at 197; Dodakian v. United States, supra, 2016 WL 3866581 at *9; Colotti v. United States, supra, 2011 WL 6778475 at *11; Layton v. Phillips, supra, 2008 WL 413785 at *5.

              5.   Investigative Reports
                   and Interview Notes
                   Concerning Ded Nicaj

DiPietro also seeks this information in support of his claim that the government violated its Brady obligations with respect to Nicaj.

In the August 2011 Order, I rejected DiPietro's request for discovery concerning Nicaj on the ground that DiPietro

31

offered only hearsay evidence suggesting a possible <u>Brady</u> viola-
tion and that such hearsay evidence was insufficient to establish
good cause for discovery.  DiPietro's motion for reconsideration
ignores the basis for my prior ruling and offers no reason to
reconsider it.

In opposing DiPietro's original motion for discovery,
the government offered a declaration from FBI Special Agent Rico
Falsone which stated, among other things, that the government had
no record of an interview with Nicaj (DiPietro Recons. Mem., Ex.
G).  In his motion for reconsideration, DiPietro attempts to
impugn the credibility of Special Agent Falsone's statement that
no notes of interviews with Nicaj exist.  However, my August 2011
Order did not deny discovery concerning Nicaj on the basis of
Special Agent Falsone's statement; rather the reason for the
ruling was DiPietro's failure to show good cause for the discov-
ery.  Thus, even if I were now to find that Special Agent
Falsone's credibility had been impeached, reconsideration would
not be warranted because Special Agent Falsone's statements
played no role in my prior ruling concerning Nicaj.

Thus, because DiPietro has not demonstrated any flaw in
my prior ruling, there is no basis to reconsider that ruling.

32

6.   WCDAO Notes of Proffer Sessions
     or Other Interview Notes
     Concerning Din Celaj and Mark Nickolson

DiPietro next seeks WCDAO notes of proffer sessions or other interview notes concerning Din Celaj and Mark Nickolson, again on the theory that this discovery will disclose a Brady or Giglio violation.

My August 2011 Order denied discovery of notes of interviews of Celaj on the ground that plaintiff had offered no specific evidence that the discovery sought would demonstrate that petitioner was entitled to relief.  DiPietro's prior motion did not seek any discovery with respect to Nickolson.  In support of his motion for reconsideration, DiPietro makes the following argument:

> Information obtained through Freedom of Informa-
> tion Act (FOIA) requests now confirms that the WCDAO --
> with whom Din Celaj and Mark Nicholsyn [sic] first
> agreed to cooperate -- possesses documentary evidence
> relating to its cooperators/confidential informants
> against DiPietro that should have been produced as §
> 3500 materials.  As evidenced by a fax cover sheet of
> WCDAO Assistant District Attorney (ADA) Frank L. Priolo
> (Exhibit L, p. 1), some of these WCDAO materials were
> sent to the FBI.  The FBI also documented receipt of
> such materials from the WCDAO.  Id. at 4.  Even though
> proffer agreements for both Celaj and Nicholsyn [sic]
> with the WCDAO have been unearthed, no WCDAO proffer
> notes, reports of investigation, or other discoverable
> materials relating to Celaj or Nicholsyn [sic] were
> ever disclosed to the defense.  This Brady/Giglio
> evidence was in the Government's possession, and would
> have been fertile ground for impeachment on other

> benefits received of inconsistent statements that
> appeared therein.

(DiPietro Recons. Mem. at 22).

DiPietro's argument fails, however, because the pur-
ported factual back up for the argument does not even remotely
support DiPietro's claims.  Exhibit L to DiPietro's Recons. Mem.
consists of four pages.  The first page is a heavily redacted fax
cover sheet reflecting the transmission of a 15-page fax on
August 26, 2003 from "FLP" to an individual identified only as
"SA," an abbreviation that I presume stands for Special Agent.
The bottom of the cover sheet bears the footer routinely gener-
ated by fax machines indicating that the cover sheet is page 1 of
a fax sent on August 26, 2003 at 11:48.  The rest of Exhibit L
consists of three pages of a heavily redacted FBI form dated
January 18, 2006 that lack the machine generated footer that
appears on the first page of Exhibit L.  Because these three
pages are dated two and one-half years after the fax cover sheet
and do not bear the footer, I conclude that they were not part of
the fax transmission.  The three pages appear to be a redacted
list of subfiles generated in the course of an investigation
entitled "Trojan Horses" and list file titles such as "All
Original FD-302s," "All Background Information," "Case Expendi-
tures," "Westchester County T3 Affidavits," etc.  There are no

34

references by name or by implication to either Celaj or Nickolson
nor are there any entries that can fairly be construed to refer
to interview notes or proffer notes.  In short, there is not a
scintilla of evidence supporting DiPietro's argument that excul-
patory or impeachment material with respect to either Celaj or
Nickolson was transmitted from the WCDAO to the FBI and withheld
from DiPietro.  There is, therefore, no reason to revisit my
August 2011 Order with respect to Celaj and no reason to permit
discovery with respect to Nickolson.

> 7. All Law Enforcement Reports,
>    Notes and Agreement Pertaining to
>    Mustafaj or a Specific Averment
>    that No Such Evidence Exists

FBI reports produced as a result of my August 2011
Order demonstrate that Bashkim Musatafaj was a criminal associate
of Sanginiti; however, Mustafaj did not testify at DiPietro's
trial.  DiPietro claims that the Form 302 reports describing the
FBI's interviews of Sanginiti that were produced as a result of
my August 2011 Order indicate that Mustafaj and Sanginiti engaged
in the same type of criminal activity of which DiPietro was
convicted and that this information could have been used to
impeach Sanginiti.  Specifically, DiPietro cites the following:

> • "Mustafaj knows a number of young people who have
>    access to drugs and are engaged in other illegal

> > activities.  Mustafaj has the ability to broker a
> > drug deal in which he would profit. In the past,
> > on approximately five occasions, Mustafaj obtained
> > small amounts of cocaine for [Sanginiti].  As of
> > the time of [Sanginiti's] arrest, Mustafaj was
> > selling drugs to [Sanginiti's] brother." . . .

> - Sanginiti and Mustafaj had engaged in extortion
>   together, including of a victim named "Mush." . .
>   .

> - Mustafaj engaged in credit card fraud/bust out
>   schemes. . . .

> - Mustafaj engaged in medical insurance fraud
>   schemes. . . .

(DiPietro Recons. Mem. at 23-24).

DiPietro's argument again ignores the record.  My August 2011 Order denied discovery concerning Mustafaj because DiPietro's own "evidence" concerning Mustafaj -- a memorandum of an interview of Mustafaj prepared by DiPietro's investigator -- states that Mustafaj told DiPietro's investigator that Mustafaj had never been interviewed by the FBI (Tab 3 of Ex. A to DiPietro's Memorandum of Law in Support of his 2255 Motion, dated March 22, 2010 (D.I. 1 in 10 Civ. 2585)).  Because DiPietro's own evidence actually indicates that the discovery sought does not exist and DiPietro has offered nothing suggesting that Mustafaj's statements to DiPietro's investigator that he had never been interviewed were false, there is no basis to revisit my August 2011 Order with respect to Mustafaj.

8.  All Still-Outstanding
    Reports and Rough Notes
    and the Substance of any
    Oral Statements Given to
    Law Enforcement or Prosecutors
    -- Including Those of the
    <u>WCDAO -- Regarding Perazzo</u>

Prior to trial, the prosecution provided all defen-
dants' counsel with the FBI Form 302 report reflecting the
government's interviews of Perazzo on May 11, 17 and 20, 2004,
and the underlying notes from those interviews (Mem. in Opp. to
Discovery at 13-14).  The letter transmitting these documents
also stated:

> Based upon repeated arguments made by various
> defense counsel during the course of this matter, we
> write to reiterate to each of you that John Perazzo is
> available for you to subpoena as a witness in this
> case, should you desire his testimony during your
> defense case.  As you each know, Mr. Perazzo is cur-
> rently incarcerated and is in state custody upstate.
> If anyone wishes to call him as a witness in this
> matter, we will do everything within our power to have
> him transported here for testimony.

(Gov't Opp. Mem., Ex. A).  Despite the foregoing, DiPietro did
not call Perazzo as a witness at trial.  DiPietro now claims that
Perazzo made statements years after the trial that may tend to
exculpate DiPietro (DiPietro Recons. Mem. at 25-26).

It is not entirely clear what viable claim DiPietro
could make with respect to Perazzo.  Perazzo did not testify at
trial; thus, his allegedly exculpatory information does not rise

to the level of witness recantation.[13]  Nor do Perazzo's state-
ments constitute newly discovered evidence.  "[N]ew evidence in a
§ 2255 proceedings . . . is evidence that is discovered after the
original hearing, and which could not, with due diligence of
counsel, have been discovered sooner." Giacalone v. United
States, 739 F.2d 40, 43 (2d Cir. 1984) (internal quotation marks
omitted); accord United States v. Siddiqi, 959 F.2d 1167, 1173
(2d Cir. 1992); United States v. Ajemian, 193 F. Supp. 3d 298,
300 (S.D.N.Y. 2016)  (internal quotation marks and citations
omitted.), appeals filed sub nom., Lesniewski v. United States,
Docket No. 16-2380 (2d Cir. July 6, 1980) and Ajemian v. United
States, Docket no. 16-2534 (2d Cir. July 14, 2016).  Perazzo was
always known to be one of the victims of DiPietro's conduct; the

---

[13]        The Second Circuit has cautioned that "witness
        recantations 'must be looked upon with the utmost
        suspicion'" because they (1) upset societal interests
        in the finality of convictions, (2) often are
        unreliable and offered for suspect motives, and (3) in
        many cases simply impeach cumulative evidence rather
        than undermine the accuracy of a conviction.  For this,
        among other reasons, an applicant for relief based on
        an alleged recantation must submit a specific sworn
        statement by the witness.  A "general, unsworn
        recantation . . . is insufficient to contradict sworn
        trial testimony."

Salazar-Espinosa v. United States, 11 Civ. 0247 (LAK), 2011 WL
2946166 at *2 (S.D.N.Y. July 11, 2011) (Kaplan, D.J.) (ellipses
in original), citing Haouari v. United States, 510 F.3d 350, 353
(2d Cir. 2007).

38

government's disclosures of its interviews of Perazzo eliminates
any doubt in that regard.  Whatever information Perazzo had could
have been discovered prior to DiPietro's trial.  Finally, given
Perazzo's history as an admitted con artist and Ponzi scheme
operator, it seems highly unlikely that uncorroborated testimony
from him could justify relief.  As explained by the late Honor-
able Leonard B. Sand, United States District Judge:

> "In order to obtain" relief under § 2255 "based upon
> newly-discovered evidence, petitioner bears a heavy
> burden of convincing the court that the
> newly-discovered evidence would have resulted in an
> acquittal." Pri-har v. United States, 83 F. Supp. 2d
> 393, 399 (S.D.N.Y. 2000).  "Such motions 'based upon
> previously-undiscovered evidence [are] ordinarily not
> favored and should be granted only with great cau-
> tion.'"  Id. (quoting United States v. Stofsky, 527
> F.2d 237, 243 (2d Cir. 1975).  Finally, to argue that
> this evidence demonstrates his actual innocence, "peti-
> tioner must demonstrate that, in light of all the
> evidence, it is more likely than not that no reasonable
> juror would have convicted him." Bousley v. United
> States, 523 U.S. 614, 623 (1998).

Brown v. United States, 10 Civ. 2380 (LBS) 05 Cr. 857 (LBS), 2011
WL 3273202 at *6 (S.D.N.Y. Aug. 1, 2011) (Sand, D.J.) (alteration
in original).

Because DiPietro has not shown why my August 2011 Order
should be reconsidered and has not shown how the discovery sought
could support a viable claim, his application for discovery of
additional material with concerning Perazzo is denied.

9.   Summary

DiPietro has not succeeded in making the dual showing required to obtain any of the discovery he seeks.  He has not shown that my August 2011 Order overlooked any controlling facts or precedents, nor has he shown the good cause necessary to warrant discovery in a 2255 proceeding.  His motion is, therefore, denied.

IV.   Conclusion

Accordingly, for all the foregoing reasons, DiPietro's motion for reconsideration of my August 2011 discovery order (D.I. 19) is denied.

The due date for petitioners' reply papers is adjourned without date pending resolution of issues raised in D.I. 83 in 10 Civ. 199.[14]

Dated:   New York, New York
         March 29, 2017

                                   SO ORDERED

                                   _____
                                   HENRY PITMAN
                                   United States Magistrate Judge

_____

[14]To the extent any additional motions for discovery are outstanding, they will be addressed in the Report and Recommendation resolving these matters.

40

Copies transmitted to:

Mr. Michael Pizzuti
Reg. No. 51089-054
FCI Danbury
Federal Correctional Institution
Route 37
Danbury, Connecticut  06811

Mr. Joseph Genua
Reg. NO. 56988-054
RRM New York
100 29th Street
Brooklyn, New York  11232
Anthony Dipietro, Esq.
15 Chester Avenue
White Plains, New York  10601

Joseph A. Bondy, Esq.
Suite 1200
20 Vesey Street
New York, New York  10007

Hadassa R. Waxman, Esq.
Eli J. Mark, Esq.
Assistant United States Attorneys
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007